OPINION OF THE COURT
Kaye, J.
This tragic case pits two couples — each found to be fit as parents — against each other for custody of Sarah K, now two years old. Sarah, who has Down’s Syndrome, was shortly after her birth released for adoption by respondents, her biological *228 parents; her only home has been with appellants, her adoptive parents. When Sarah was 15 weeks old, on the eve of a hearing relating to her adoption, respondents attempted to revoke the consent they had given three months earlier and regain custody of the child. While respondents challenge the validity of both the statute governing private-placement adoptions (Domestic Relations Law § 115-b) and the consent forms they signed, we conclude that in the circumstances presented the defects of which they complain did not harm them, that their "irrevocable consent” must be honored, and that the Appellate Division order returning Sarah to them should therefore be reversed and the petition for adoption granted.
I
The pertinent facts found by Family Court are as follows. Sarah was born November 6, 1983 to respondents, Warren and Christine K. Shortly after her birth, the obstetrician entered the recovery room and announced his belief that "the baby is a mongoloid.” Respondents decided that they could not keep the child. On November 7, Mr. K told the hospital social worker they had definitely decided to place the child for adoption.[1] She provided him with a list of three agencies as well as the name Janet Márchese, an individual who had previously found adoptive homes for Down’s Syndrome children. That same day Mrs. K went home, leaving Sarah behind. Mr. K contacted the agencies as well as Mrs. Márchese. Mr. K assured Mrs. Márchese that respondents only wanted to find a home for Sarah, that he had done his homework, was sure of their decision, that neither he nor his wife wanted to meet with prospective adoptive parents, and that this was to be accomplished immediately.
Mrs. Márchese on November 8 advised Mr. K that she had found adoptive parents and asked that respondents pay the legal fee for the adoptive parents’ counsel, David Ver plank, explaining that the adoptive parents would likely later incur significant medical expenses. According to Mrs. Márchese, Mr. K — a lawyer — said his partner would represent him. According to Mr. K, however, neither he nor his partner (Bruce Regenstreich) had any experience in adoption matters, and his *229 partner participated as a friend. Mr. K testified that he assumed Mr. Verplank represented them, or represented both the natural and adoptive parents in an uncontested proceeding. Family Court found that Mr. K’s only interest was in an expedited adoption, that the technical question of representation was of no particular significance to him at that time, that Mr. Verplank did not believe he represented respondents, and that respondents did not rely on him for advice or consider him their attorney.
On November 8 Mr. Regenstreich called Mr. Verplank, who drafted the adoption consent forms. On November 11, when the baby left the hospital, she was immediately handed over by Mr. K to a nurse accompanying Mr. Verplank, and since that day she has lived with appellants. At the hospital also, Mr. Verplank delivered to Mr. Regenstreich an envelope of documents, including two consent forms, a bill, an attorney’s affidavit and a natural parents’ affidavit, and Mr. Regenstreich in turn gave the envelope to Mr. K.
For more than two weeks the documents remained in Mr. K’s desk drawer at home, during which time respondents took a brief trip with their son. Then, during the weekend after Thanksgiving (November 26 or 27), Mr. K looked at the documents for — in his own words — "no more than two minutes the whole packet,” and he signed both consent forms. The first, captioned "Irrevocable Consent,” reads
"State of New York Family Court DRL 115 b — la County of Suffolk
Address: Veterans Memorial Highway Hauppauge, N. Y. 11787
In the Matter of the Adoption Irrevocable Consent of___ Adoptive Child
I, [respondents’ names], residing at [respondents’ address], natural (Mother) (Father) of _, do hereby irrevocably Consent to the Private Placement Adoption of my (daughter) (xxx)_, born Nov. 6, 1983. I understand that in the event that Consent is not executed before a Judge of the Family Court, the County of Suffolk then and in that event this Consent shall become irrevocable thirty days after the commencement of the adoption proceeding unless written notice *230 of revocation thereof shall be received by this Court within said thirty days.**
The name and address of the Court in which the adoption proceeding is to be commenced is:
Family Court
County of Suffolk
Address: Veterans Memorial Highway
City: Hauppauge, New York 11787
_[Signed]_
Natural Mother
_[Signed]_
Natural Father
** We came to our decision to place our baby for adoption because of her Down’s Syndrome condition and our belief that the petitioners are far more capable of dealing with this condition and raising the child than we are.”
The second document, also captioned "Irrevocable Consent,” reads:
"State of New York DEL 115-b — la
Family Court
County of Suffolk
Address: Veterans Memorial Highway Hauppauge, N. Y. 11787
In the Matter of the Adoption Docket No. of_ Irrevocable Consent Adoptive Child
I, [respondents’ names], residing at [respondents’ address], natural (Mother) (Father) of_do hereby irrevocable [sic] Consent to the Private Placement Adoption of our (daughter) (xxx)_, BOEN November 6, 1983. I understand that the Consent I am now giving to said adoption is final and irrevocable and that hereafter I will not be able to regain custody of my (daughter) (xxx)_from (her) (xxx) adoptive parents and that I will not be able to maintain an action or proceeding for the return of custody of said child to me. We came to our decision to place our baby for adoption because of her *231 Down’s Syndrome condition and our belief that the petitioners are far more capable of dealing with this condition and raising the child than we are.
_[Signed]_
Natural Mother
_[Signed]_
Natural Father

On this_day of_, 19_, before me personally came [respondents’ names], proven to me by the oath of David H. Ver plank an attorney admitted to practice in the State of New York to be the person(s) described in and who executed the foregoing instrument, and they acknowledge that they executed the same.
Judge, Family Court”
At Mr. K’s request, Mr. Ver plank had added the following sentence, which was part of both consent forms when respondents signed them: "We came to our decision to place our baby for adoption because of her Down’s Syndrome condition and our belief that the petitioners are far more capable of dealing with this condition and raising the child than are we.”
Family Court found that Mr. K had concluded, from looking at both consent forms together that nothing would be final until he and his wife appeared in court. Mr. K so advised his wife, who then signed the documents without even reading them. On November 28, when he returned to work, Mr. K delivered the signed documents to his partner for transmittal to Mr. Verplank.
Appellants commenced the adoption proceeding in Family Court, Suffolk County, on December 19, 1983, but it was not until January 23, 1984 that Mr. Regenstreich received notice from the court that a petition for adoption had been filed and a hearing would be held March 1. Mrs. K said that in February she "began to face the reality of the whole situation that [she] had a daughter with Down’s Syndrome,” and toward the end of the month visited a school for Down’s Syndrome children. On February 28, Mr. K told Mr. Regenstreich that they did not want to go forward with the adoption. The next *232 day, after checking the statute and contacting the Family Court clerk’s office, Mr. Regenstreich advised Mr. K. that a revocation of consent form had to be executed, and that the March 1 court date had been canceled. On February 29, 1984, respondents executed and mailed a revocation of consent, which Messrs. K and Regenstreich had prepared. The form was received by the court March 2.
A bifurcated trial was scheduled by Family Court, consisting of a revocation hearing to consider the validity of the consents executed by respondents and the effect of their attempted revocation and, depending on the result, a best interests hearing to consider what placement would best serve the child’s interests (Domestic Relations Law § 115-b [1] [d] [ii]).
After a lengthy trial, by decision dated September 24, 1984, Family Court determined that the extrajudicial consent procedures as applied had deprived respondents of their right of revocation. In reaching this conclusion, the court rejected respondents’ contention that their consents were vitiated by a state of despair and confusion following the birth, constituting "fraud, duress or coercion in the execution or inducement of an adoption consent” (Domestic Relations Law § 115-b [4]). The court found that while respondents were unquestionably in acute emotional turmoil, the evidence did not support a conclusion that grief rendered them incapable of "a rational, although difficult, decision towards the end of November to place Sarah”, and further that the "decision to place Sarah for adoption was essentially a calculated and firm one; the parents did not suffer from indecision or ambivalence. * * * Their initial decision to place Sarah was ratified by implication on each day that passed after the consent was executed, without objection until months after the fact.” Similarly, the court concluded that any violation of the Social Services Law regarding placement of children for adoption — although it found no violation here — would be redressed by sanctions against the violators, and would not entitle respondents to dismissal of the adoption petition. But the court agreed with respondents’ constitutional challenge, based on a confusion engendered by the two forms and respondents’ reasonable belief that they could revoke their consent until it was given before a judge. The court concluded that the remedy was to afford respondents a best interests hearing, which would place them in the position they would have been in had they received proper notice of their revocation rights under the statute and revoked their consent accordingly.
*233 To resolve the issue of which placement would serve the best interests of the child, Family Court considered the testimony of 28 witnesses. On the basis of financial status, character, mental and physical health, ability to provide for the child’s needs, available support from extended family members, continuity and stability, and capacity to accept the child, the court determined by decision dated November 7, 1984, that Sarah’s best interests would be served by adoption by appellants.
The Appellate Division, in three opinions, reversed, two justices finding the statute unconstitutional on its face for failing to require that the extrajudicial consent form advise the biological parents that even timely revocation will at best result in a judicial determination of custody based on a "best interests” test, two justices concluding that the particular consent forms misled respondents, and one justice concurring in part, dissenting in part, on the ground that the appropriate remedy for any confusion here was the hearing to determine the child’s best interests.[2]
II
A parent’s consent to the release of a child for adoption has consequence in the law, and cannot invariably be undone at will. The law recognizes that consent implicates not only the very fundamental interests of birth parents, whose decision initiates the process, but also the child’s substantial interests in a stable, continuous home environment, and those of third parties, the adoptive parents, who but for the consent would not have become involved.
Domestic Relations Law § 115-b governs extrajudicial consent to private-placement adoptions, which is the subject of this appeal. Placed in its historical setting, section 115-b was enacted in 1972 to reform statutory and decisional law, perceived as unfair to adoptive parents and unsettling to adoptions generally, which permitted biological parents to revoke consent any time before the final order of adoption and recognized their primacy of status (L 1972, ch 639; L 1973, ch 1035). (See, e.g., People ex rel. Scarpetta v Spence-Chapin *234 Adoption Serv., 28 NY2d 185, 192, appeal dismissed sub nom. DeMartino v Scarpetta, 404 US 805; People ex rel. Kropp v Shepsky, 305 NY 465.) An effort was made by this reform to introduce certainty and finality by limiting a parent’s right to revoke consent, with the stated intention of balancing the rights of surrendéring parents, adoptive parents and children. "This legislation is intended to provide a legal framework within which future adoptions can be undertaken with reasonable guarantees of permanence and with humane regard for the rights of the child, the natural mother and the adoptive parents”. The statute provided "stronger guarantees of the permanence of child adoption arrangements involving authorized social agencies and private-placement adoptions. * * * The uncertainty under which the adoptive parents are now required to live cannot but adversely affect the relationship between them and the child during the period prior to the actual adoption. * * * The broad damage that was done by the recent cases was to strike terror in the hearts of prospective adoptive parents and actually discourage other parents from entertaining adoption.” (1972 NY Legis Ann, at 202, 203.)[3] "[T]his desire for certainty is desperately needed by adoptive parents as well, who at present are living under the shadow of fear by recent court decisions. The bond, the love, the intense emotion between adoptive parents and the child placed in their home, is created the very moment their dream is fulfilled and a child comes through the door of their home. The unconscionable uncertainty and gap in our laws on this subject at present will be remedied by this bill.” (Memorandum from Office of Senate Temporary President, Bill Jacket,' L 1972, ch 639.)
The objective of adding certainty and finality was achieved by the following statutory scheme. Consents executed or acknowledged before a judge or surrogate in which the adoption proceeding was to be commenced (judicial consents), if they so stated, became immediately irrevocable (Domestic Relations Law § 115-b [1] [c]). Consents not so executed or acknowledged (extrajudicial consents), if they so stated, became irrevocable 30 days after commencement of the adoption proceeding un *235 less written notice of revocation was received by the court within that 30-day period (Domestic Relations Law § 115-b [1] [d] [i]). Even if such consent were timely revoked, however, the child would not be returned to the biological parents where the adoptive parents opposed revocation, but the revocation would be given effect only where the court "shall have determined that the best interests of the child will be promoted by giving force and effect to such revocation” (Domestic Relations Law § 115-b [1] [d] [ii]). In a best interests proceeding, biological parents had no right to custody superior to that of adoptive parents, notwithstanding that they were fit, competent and able to maintain, support and educate the child. Custody was to be awarded solely on the basis of the child’s best interests, without any presumption that such interests would be promoted by any particular custodial disposition (Domestic Relations Law § 115-b [1] [d] [ii]; [3]).
Respondents’ quarrel is not with the underlying substance of the statute. Indeed, a position that biological parents can revoke consent at any time until the adoption becomes final, or that they are entitled to a primacy of status over the adoptive parents in any dispositional hearing, would be a return to the law prior to the legislative reform and precisely contrary to the very purposes for which the statute was enacted. Nor do respondents claim that extrajudicial consents to private-placement adoptions are per se invalid, or that the Legislature is without power to make such consents irrevocable after a fixed period, or that a 30-day period is unreasonable.
Rather, respondents claim that they were not afforded proper notice of the operation and effect of the statute, in three respects.[4] First, respondents urge that the statute is defective because it does not require notice to the biological parents of the commencement of an adoption proceeding, so *236 they can know when their 30-day revocation period begins. Second, they contend that the statute does not, but should, require that biological parents be informed that, upon revocation, they do not necessarily secure the return of their child, but may face a best interests hearing in which they stand on equal footing with the adoptive parents. Third, apart from the particular statute or language of either document, respondents contend that their consent must be invalidated because, when the two forms were read together, they fostered a misleading belief that consent was only tentative until respondents appeared in court.
The purported failure of the statute or extrajudicial consent forms to provide for notice of either the commencement of the adoption proceeding or the limited right of revocation — respondents’ first two contentions — has several times elicited judicial criticism.
In Matter of Anonymous (55 AD2d 383), the biological parents sought to revoke their extrajudicial consent to adoption on the ground that the statute failed to provide for notice to them of the commencement of the adoption petition. While the majority concluded that in the circumstances it was not necessary to reach the issue of constitutionality of the statute, the dissenting justice would have declared the statute unconstitutional for failing to require in the extrajudicial consent any provision for adequate notice to biological parents as to when the adoption proceeding is commenced. He concluded that "[ijnsofar as the statute herein clearly affects the right of natural parents to the care and custody of their child, a right deemed 'essential,’ 'basic’ and 'precious’ [citations omitted] it is incumbent upon the State to provide adequate notice to the natural parents before a child is irrevocably taken away from them.” (Id., at p 387.)
In Matter of Daniel C. (115 Misc 2d 130, affd 99 AD2d 35, affd 63 NY2d 927), while the courts concluded that the mother lacked standing to challenge the statute because in the particular circumstances she had not been misled, concern was voiced at every level about the extrajudicial consent form: The acting surrogate recognized that a lay person "could easily infer from the language of the form that * * * the consent * * * could be revoked and upon revocation the parties would be restored to a status quo position,” and urged that "the official form should be revised so as to eliminate any possibility of a natural parent being deceived on the one hand, or on *237 the other hand being in a position to [claim] that he was deceived.” (115 Misc 2d, at pp 133-134.) The Appellate Division majority noted that the case should not "become the springboard for returning the State to the deplorable situation that prevailed before the enactment of section 115-b”, and concluded that "[i]f the statute has defects, the cure is with the Legislature.” (99 AD2d, at p 47.) The dissenting justice, however, would have dismissed the adoption petition because the consent did not advise a signatory that timely revocation would not result in return of the child (99 AD2d 47, 70). We agreed with the Appellate Division majority that, by reason of the biological mother’s lack of standing, it was not necessary to reach any constitutional issue, but the dissenting judge in this court concluded that the consent form complied with neither statutory nor due process requirements (63 NY2d, at p 929 [Jasen, J., dissenting]).
In the present case, Family Court, addressing section 115-b, described the proceeding as presenting "a tragic scenario of misguided practices which should rightfully sound the alarm for reform of the adoption procedures in this state.” Two Appellate Division justices, in reversing, found the statute unconstitutional on its face in failing to require that the consent form advise the natural parents of all the consequences of a timely revocation of consent, noting that the attack on the statute’s failure to provide they be given notice of when the 30-day revocation period commences "also has merit.” (110 AD2d, at p 25, n 2.) The other two justices of the majority concluded that, on the facts, respondents did not give final and unequivocal consent to the adoption, but agreed that the statute was "badly flawed” in failing to provide for notice as to commencement of the adoption proceeding, and "troubling” in its failure to require notice that timely revocation at most results in a best interests hearing, not return of the child. (110 AD2d, at pp 30, 31.)[5]
In each year of the past three years, there have been more than 7,000 adoptions (Source of Statistics: Office of Court Administration). In the extraordinary circumstances presented, where the statute is necessarily in wide use, where *238 any defect may have profound impact on the lives of children and families, and where deeply troubling constitutional issues have several times been identified but have typically evaded review, we will first consider whether there is any infirmity in the statute or the consent forms, as alleged, before reaching the question of the parties’ particular circumstances (see, People v Liberta, 64 NY2d 152; People v Parker, 41 NY2d 21, 25).
We approach this inquiry bearing in mind that a statute will be interpreted, if possible, so as to uphold its constitutionality (see, Loretto v Teleprompter Manhattan CATV Corp., 58 NY2d 143, 149), and in accordance with its manifest intent and purpose (see, Matter of Sabot v Lavine, 42 NY2d 1068, 1069). We read Domestic Relations Law § 115-b to require that extrajudicial consent forms advise biological parents of the effect of their act, so that they are fully informed of their limited rights in the event they choose to make timely revocation, and we further conclude that the right to revoke consent runs from the date the biological parents are notified of the commencement of an adoption proceeding.
Section 115-b (1) begins: "If a duly executed and acknowledged consent to a private-placement adoption shall so recite, no action or proceeding may be maintained by the consenting parent for the custody of the child to be adopted, and no such consent shall be revoked by such parent if’. Among the subparagraphs of the section is (d) (ii), providing: "Notwithstanding that such written notice shall have been received within said thirty days, the notice of revocation shall be given effect only if the adoptive parents fail to oppose such revocation, as provided in subdivision three of this section, or, if they oppose such revocation and the court as provided in subdivision three of this section shall have determined that the best interests of the child will be promoted by giving force and effect to such revocation.” We read subdivision 1 to mean that, in order to fulfill the requirements of the statute, a consent must set forth the substance of what is provided in the entire paragraph, as appropriate, including the provisions of paragraph (d) (see, Dennis T. v Joseph C., 82 AD2d 125). This is in keeping with the expressed fundamental premise and objective in enacting section 115-b that a parent’s consent should be knowledgeable (see, Memorandum in Support, Chief Sponsor, Bill Jacket, L 1972, ch 639). Just as Domestic Relations Law § 115-b (2), involving judicial consents, requires the court to inform a parent of the consequences of consent, so in the *239 case of extrajudicial consents, where there is no judge or surrogate to discharge this function, the mandates of section 115-b (1) serve to notify parents of the consequences of their consent.[6]
Similarly, section 115-b (1), in fixing a reasonable time limitation on the right to revoke consent, presumes that the biological parent will receive notification of the adoption proceeding. Domestic Relations Law § 111 (3) provides that "Notice of the proposed adoption shall be given in such manner as the judge or surrogate may direct and an opportunity to be heard thereon may be afforded to a parent whose consent to adoption may not be required pursuant to subdivision two, if the judge or surrogate so orders.” Since the Legislature provided for a 30-day revocation period as of right, triggered by the adoption proceedings, it may fairly be implied that notice to the biological parents of the proceedings is required. Where they are not notified at the commencement of the adoption proceedings, then their 30-day period to revoke consent must begin to run when they are furnished notice.
Thus, we conclude both that Domestic Relations Law § 115-b requires that extrajudicial adoption consents notify the biological parents of the limited nature of their right of revocation, and that their 30-day revocation period runs from notice to them of the commencement of an adoption proceeding.
Ill
We next turn to the application of these principles to respondents’ contentions that their consents should be vitiated because they were improperly denied notice of the commencement of the adoption proceeding or the effects of timely revocation, and because they were misled by both forms and mistakenly, believed their consent was tentative until they appeared in court.
Although respondents did not receive notice of the adoption proceeding until a month after it had been commenced, and although the extrajudicial consent respondents signed failed to *240 advise them of the consequences of a timely revocation, respondents suffered no injury as a result of either omission. It is axiomatic that there is no standing to complain where an alleged defect in or violation of a statute does not injure the party seeking redress (cf. Ulster County Ct. v Allen, 442 US 140, 154-155). Birth parents obviously would have no standing to complain that the consequences of timely revocation were omitted from consent forms if they were otherwise fully informed of those consequences (see, Matter of Daniel C., supra), or if they made no effort to revoke consent within 30 days of notification of the adoption proceeding. In either case absence of information from the form would not have affected them.
Respondents were entitled to receive notice of the commencement of the adoption proceeding, and the 30-day period for revocation of their consent could not begin to run against them until they were furnished such notice. Here, respondents were not advised when the adoption proceeding was commenced on December 19, 1983, but they were notified by Family Court on January 23 that there would be a preliminary hearing in connection with the adoption, including the case caption number, and surely knew then that an adoption proceeding had been commenced. Their right to revoke therefore must be measured from that date, and it ended 30 days later, on February 23. Respondents’ revocation on February 29, received by Family Court March 2, 1984, was plainly untimely. Having failed to revoke their consent within the 30-day statutory period, respondents cannot complain of a failure to advise them of what the consequences of a timely revocation would have been.
Respondents urge, however, that their tardiness should be excused, and the revocation treated as timely, because they believed that they could revoke their consent until they appeared in court in connection with the adoption. Although respondents may indeed have believed that their revocation was timely until a court appearance, their confusion was not caused by either consent form. Each form was captioned "Irrevocable Consent.” The judicial consent form they signed stated "the Consent I am now giving to said adoption is final and irrevocable”. The extrajudicial consent form they signed stated that "in the event that Consent is not executed before a Judge of the Family Court, the County of Suffolk, then and in that event this Consent shall become irrevocable thirty days after the commencement of the adoption proceeding unless *241 written notice of revocation thereof shall be received by this Court within said thirty days.” This language in and of itself was not misleading, complied with the statute, and accurately conveyed the time limitation placed on revocation by Domestic Relations Law § 115-b (1) (d) (i).
Respondents’ subjective confusion, they say, arose not from any particular defect in either form or any representation by any third person, but as a result of their having received, glanced at and signed both forms together. Under such circumstances, the language of the form, not any mistaken impression gained by one party regarding the legal consequences of that language, must control (see, Goodison v Goodison, 66 AD2d 923, 924, affd 48 NY2d 786). Similarly, Mrs. K’s failure to read the forms before she signed them can be no excuse. She is presumed to have understood the contents of the documents she signed and agreed to them (see, Metzger v Aetna Ins. Co., 227 NY 411, 416).
Moreover, neither emotional distress nor mistake is a ground for vitiating consent- under Domestic Relations Law § 115-b (4). Release or surrender of a child for adoption is a traumatic event, heightened here by Sarah’s condition. But no consent, and surely no consent to the adoption of a handicapped child, could ever be relied on if it were revocable on such a basis. Respondents were single-minded in their resolve that Sarah be adopted immediately, and they sought out — and found — the quickest way to accomplish their objective, for the perceived good of the child as well as their family. Respondents held the consent forms for two weeks before signing them, then remained steadfast in their decision for three months thereafter, knowing the child was meanwhile making a life with appellants, as her prospective adoptive parents. Their consents included a statement of belief that appellants "are far more capable of dealing with this condition and raising the child than we are.” Even when they learned of the adoption proceeding in January, for more than a month they took no action, until Mr. K and his law partner called the court and for the first time consulted the statute, and then drew up a revocation. The consequence of a mistaken impression gained from Mr. K’s "two-minute” review of the critical documents cannot be visited on others.
Respondents were thus obligated to submit any revocation within 30 days after they received notice of the adoption , proceeding, unless they could establish "fraud, duress or coer *242 cion in the execution” of the consent (Domestic Relations Law § 115-b [4]). In evaluating respondents’ claim in this regard, it is crucial to recognize that under the statute, it would be insufficient to show that one was simply mistaken as to the meaning of a form. Rather, the claim must be that the consent was signed under compulsion or threat, or against one’s free will, or based upon fraudulent statements (see, e.g., Matter of Unnamed Baby Boy, 110 AD2d 1019; Gerstein v 532 Broad Hollow Rd. Co., 75 AD2d 292, 297; Matter of E. W. C., 89 Misc 2d 64, 71-73). Such evidence or finding is absent here.
Having failed to make any effort to revoke within 30 days of notification of the adoption proceeding, respondents are bound by their consent, and appellants’ petition for adoption should have been granted. We therefore do not reach the infirmities alleged by respondents in the best interests proceeding held before Family Court, which determined on the basis of several grounds including health, character, and ability to accept and provide for the child that Sarah’s best interests were served by her adoption by appellants.
IV
While the issues before us are resolved without reaching the constitutionality of the statute, we note that the reforms of 1972 were motivated by the Legislature’s concern that controversy and uncertainty overhung adoptions. Because certain dissatisfactions with the statute in its actual application have now several times been identified in the case law and literature, we believe it would be highly desirable for the Legislature to examine Domestic Relations Law § 115-b in the light of 13 years’ experience, for it appears that the well-founded concerns that engendered the law are not yet dispelled.
Accordingly, the order of the Appellate Division should be reversed, with costs, and the petition for adoption granted.
Chief Judge Wachtler and Judges Jasen, Meyer, Simons, Alexander and Titone concur.
Order reversed, etc.

. As noted in the partial dissent at the Appellate Division, the hospital social worker suggested that respondents speak with someone from the Down’s Syndrome School in Bellmore, or a family with a Down’s Syndrome infant, but they were very determined to proceed with the adoption.

. The Appellate Division, in its plurality opinion, found the remaining points raised by respondents as grounds for invalidating their consents — (1) duress, (2) lack of counsel and (3) alleged violations of Social Services Law §§ 371 and 374 — to be without merit, as Family Court had found. We conclude that these findings are fully supported by the record.

. In 1971 the Governor disapproved a similar bill which would have granted to consenting parents an absolute right to bar an adoption during the 30-day revocation period. "This objectionable provision has been eliminated, thereby affording our courts adequate discretion to protect children from traumatic disruption of long-standing placements.” (Governor’s Memorandum, 1972 NY Legis Ann, at 360-361.)

. The consent forms essentially followed the statute, so that respondents’ arguments may be considered as addressing the statute, or the forms, or both. In three respects respondents’ consents differ from those presented by prior case law (see, e.g., Matter of Daniel C., 63 NY2d 927). First, while the statute provides for judicial or extrajudicial consents, in the disjunctive, respondents signed both. Second, a sentence was added to both consents at respondents’ request stating the reason for the release (see, at p 231, supra). Third, a modifier such as "this” or "such” does not appear before the word "Consent” in the second sentence of the extrajudicial consent they signed.
While the consents in issue were prepared by Mr. Verplank, they follow forms that have been in regular use. See, 10 McKinney’s Forms, Matrimonial and Family Law §§ 14:86D, 14:86E (1985 Supp Pamphlet).

. In addition, extrajudicial consents have several times been found invalid (see, e.g., Matter of Unnamed Baby Boy, 110 AD2d 1019; Matter of Male Infant M., 76 AD2d 839, lv denied 50 NY2d 1056; Anonymous v Anonymous, 108 Misc 2d 1098, affd sub nom. Dennis T. v Joseph C., 82 AD2d 125, lv denied 55 NY2d 792; Matter of Janet G. v New York Foundling Hosp., 94 Misc 2d 133; Matter of James M. G., 86 Misc 2d 960).

. See, Frieden, The Constitutional Rights of Natural Parents Under New York’s Adoption Statutes, 12 NYU Rev of L & Soc Change 617, concluding that to meet constitutional requirements, all consents should be executed before a court; and Note, Natural vs. Adoptive Parents: Divided Children and the Wisdom of Solomon, 57 Iowa L Rev 171, to the same effect. See also, Matter of Anonymous (G.) (89 Misc 2d 514, 516), regarding salutary procedures to assure that judicial consents are fully informed.