*917 OPINION OF THE COURT
Renee R. Roth, S.
At issue in these contested proceedings is whether the adoption of two infant children can be granted notwithstanding the prospective adoptive father’s refusal to confirm in court his signed agreement to adopt. This controversy is a byproduct of the divorce action brought by the husband after the couple had commenced the adoption proceedings in this court.
THE PETITIONING ADOPTIVE PARENTS
Elaine is 47 years old; Donald is 79. This is their second marriage to one another. They were married for the first time in 1969. Although they divorced shortly thereafter, they continued to live together and had a daughter in 1972. The couple separated in 1976, but continued to see each other. In February 1983, Donald suffered a severe incapacitating stroke. After he was released from the hospital, he stayed with and was cared for by Elaine. In the spring, Donald asked Elaine to marry him. She said: "We weren’t so good at it the first time, why should we do it again?” In the summer, they went to France where Donald again proposed that they remarry. According to Elaine, when she expressed her reluctance because of her desire to have children, Donald agreed that they would pursue adoption. The parties remarried on August 30, 1983 in Greenwich, Connecticut. They had separate residences but in 1984 moved into a townhouse on East 71st Street with their daughter. The stairs were a problem for Donald and in 1985 he rented an apartment for himself. During the next three years, the couple searched for a suitable residence and purchased two apartments in a Park Avenue building in 1988. The apartments were being renovated when they became estranged.
THE ADOPTIVE CHILDREN
Elaine testified to her persistent efforts, with Donald’s approval, to find a child to adopt. Donald participated in this process by attending some meetings with lawyers and visiting various adoption agencies, including an orphanage in Hong Kong. In 1987, Elaine was referred to a child care agency in the Philippines where she found Baby Boy C. (born July 24, 1987), the first of the adoptive children. Elaine called her husband, who was in Australia on business, and obtained his *918 approval. Upon their return to New York, they made arrangements to bring the boy to the United States. On January 28, 1988, the couple went to the Department of Justice with their lawyer to process Baby Boy C.’s immigration papers. Donald signed a petition to classify an orphan as an immediate relative in which he certified under penalty of perjury that: "I will care for the beneficiary of this petition properly if the beneficiary is admitted to the United States”. At such time, he also was fingerprinted, which he admits, but denies having read the document which he concedes bears his signature. Following approval of such application, Elaine again traveled to the Philippines and brought Baby Boy C. back with her in February 1988. In June 1988, the child was christened at the Swedish Seaman’s Church. A picture taken at the event establishes the presence of Donald along with Elaine, their biological daughter, the pastor and the infant. They were also joined by some friends. Afterward the group went to the St. Regis Hotel for a celebration.
Prior to her trip to the Philippines, Elaine had learned that a pregnant woman in Pennsylvania was interested in surrendering her child, when born, for adoption. She testified that she consulted with Donald about this possibility and he observed that if both potential adoptions came to fruition the children, who would be close in age, would have each other for company.
After her birth on May 11, 1988, Baby Girl O., the second adoptive child, was brought to New York (Social Services Law § 374-a). According to the financial disclosure statement filed in this court (Domestic Relations Law § 115 [8]; Uniform Rules for Trial Cts, 22 NYCRR 207.55 [b] [8]), the expenses of her birth were paid by Donald.
Elaine’s testimony establishes that although both children resided with her (Baby Boy C. since Feb. 1988; Baby Girl O. since June 1988), they regularly visited with Donald. He disputes the frequency of such visits or that he played with either child. Elaine’s version, however, is corroborated by a credible witness, Irving Austin, a certified nurse’s aide who resided with and cared for Donald from January 1987 to May 1989.
Mr. Austin recalled that from the time he was hired in 1987 to October or November of 1988, Elaine visited her husband daily. Arriving in the late afternoon, she cooked their dinner and stayed until 9 or 10 o’clock in the evening. After Baby *919 Boy C. came to New York, she brought him to her husband’s apartment at least four times a week. At times she also brought Baby Girl O. The witness further testified that while Elaine worked in the kitchen, Baby Boy C. was in the living room with Donald. He said that Donald "never spoke much but he would wave a hand at him and say 'Hey little boy’ and smile at him”. It should be noted that Donald was then acutely aphasic. Mr. Austin observed that Donald had very little interaction with Baby Girl O., who was a younger infant and was kept in her carriage. The witness also corroborated Elaine’s testimony with respect to the purchase of the Park Avenue apartments. In fact, when the witness and Donald visited the apartment, Mr. Austin inquired whether the entire family would move there. Donald replied: "Yes”. However, in the late fall of 1988, Donald instructed the witness not to admit Elaine to the apartment anymore.
THE ADOPTION PROCEEDINGS
The testimony of the couple with respect to the circumstances of the actual execution of the adoption papers is contradictory. The papers were signed separately by Donald and Elaine on the same day, November 21, 1988. They were filed in this court two days later. Each party testified that the other’s signature was not present when he or she signed. Elaine stated that their attorney brought the papers to her apartment where she signed them. Donald testified that when he signed the papers in the lawyer’s office Elaine’s signature was not on them. However, he also claims that he never read the documents. Furthermore, Donald, who is a lawyer and an experienced entrepreneur, claims that when he signed the adoption papers he was unaware of their contents or significance. He does not, however, deny the authenticity of his signature.
Donald’s assertion that he was unaware of the purpose of the documents is contradicted by prior sworn statements. For example, at his deposition before trial, he was asked: "At the time you signed the petition for adoption, sir, did you intend to go forward with the adoption?” Donald replied: "Yes, sir”. He was then asked: "At the time, sir, that you signed the petition, did you know it was a petition for adoption?” "Yes, sir”, was Donald’s answer. His assertion that when he signed the papers he had no intention to complete the adoption is self-serving and incredible.
*920 Donald’s signature appears immediately above the printed words "adoptive father”. During his testimony at trial, he repeatedly stated that the only words he read were "adoptive father”. This court does not therefore credit his contention that he was unaware of the nature and purpose of the papers he was signing. Donald also claims not to have read a typed letter bearing his signature, which he personally handed to the court during a conference. Finally, it is noted for the record that after a question was raised during these proceedings with respect to Donald’s mental capacity, he was examined by a neurologist and found to be competent.
This court finds as a matter of fact that Donald knowingly and intentionally joined in the adoption proceedings and consented to the adoption of both Baby Boy C. and Baby Girl O. Even in the absence of such clear intent, he would be presumed to have understood the contents of the documents he signed and to have agreed to them (see, Matter of Sarah K., 66 NY2d 223, 241; Metzger v Aetna Ins. Co., 227 NY 411, 416). The record is devoid of any showing of fraud or misrepresentation on the part of Elaine or the couple’s common attorney.
Approximately a month after signing the petitions, the couple became estranged and discharged the lawyer who had been representing them both in this adoption proceeding. Each has since obtained and appeared by separate counsel. The former attorney was not called by either party to testify.
To date, only the first part of the two-stage proceeding for private-placement adoptions has been completed (Domestic Relations Law § 115). Pursuant to section 115 of the Domestic Relations Law, both Elaine and Donald have executed petitions consenting to the adoptions. A disinterested person has investigated the adoptive parents’ history, physical and mental health and financial circumstances (Domestic Relations Law § 116 [3]) and more than six months have elapsed since the petitions for adoption have been filed (Domestic Relations Law § 116 [1]). The consent to the adoption by the natural mother of Baby Girl O. was finalized before this court on March 1, 1989 after she and Elaine had met and discussed the unusual circumstances of the adoptive couple. Baby Boy C.’s natural parents had abandoned him in the Philippines.
To complete the adoptions, both Elaine and Donald were required to appear before the court (Domestic Relations Law § 115 [3]). The purpose of such appearance, as well as the six-month waiting period, is unclear. Since an adoption may be *921 granted only if it is in the child’s best interest (Domestic Relations Law §§ 114, 116), it would appear that the six-month waiting period and the appearance of the adoptive parents before the court are required to enable the court to determine whether the adoption promotes the infant’s best interest. But, under section 115 (9) of the Domestic Relations Law, the Surrogate is authorized to "grant the order of adoption without the personal appearance of such adoptive parent * * * for good cause shown” (emphasis added).
Therefore, Elaine, on May 30, 1989, moved to dispense with Donald’s appearance before the court. It is noted that the court became aware of the couple’s estrangement shortly before that motion was made. Several adjournments of the motion followed. On November 19, 1990, Donald cross-moved to revoke his consent to the adoptions and discontinue the proceedings. At the same time, he commenced a divorce action against Elaine in the Supreme Court. Incident to such action, Elaine has succeeded in obtaining an order requiring Donald to support both adoptive children (172 AD2d 317). Pending resolution of these motions, the court issued letters of guardianship of the children to Elaine and appointed a guardian ad litem to represent them.
The guardian ad litem has visited with the children and filed his report. In addition, the court has the benefit of a home-study report by a certified social worker. Both parties have also offered expert psychiatric testimony agreeing on only one point — that the children are bonded to Elaine and should not be removed from her custody. On the basis of all the foregoing, it is conclusively established that Elaine is a fit, devoted and loving mother who has provided a stable home for the children. Indeed, she is the only mother they have ever known. Under any circumstances, it is clear that the best interests of the children require that they remain with Elaine.
By virtue of her pending motion, Elaine seeks to meet the requirements of the second stage of the adoption proceedings. She contends that the order of adoption on the joint verified petitions and consents of husband and wife may be granted under the above-quoted section 115 (9) of the Domestic Relations Law by this court simply dispensing with the appearance of Donald on the ground that the "good cause shown” is the best interest of Baby Boy C. and Baby Girl O. She argues that after assisting in her efforts to obtain the children, permitting the transfer of the children’s custody and consenting to their *922 adoption, Donald should not be allowed, at this late stage, to revoke his consent.
Donald argues that Elaine need merely agree to a divorce— presumably on terms favorable to him — in order to become eligible to adopt as a single person. It is unfortunate that these children are apparently being used as bargaining chips in the pending matrimonial action. On his part, by seeking to revoke his consent to the adoptions, Donald refuses to accept the role of adoptive father. He furthermore asserts that if this court should compel the adoption, he will refuse financial support for the children and will not play any role as their custodial parent. According to Elaine, however, he was never expected to become a custodial parent — never having assumed such a role even with their natural daughter.
The issue is whether this court has the authority to grant the order of adoption on the basis of the petitions and consents of both adoptive parents, despite Donald’s belated request to revoke his consent.
THE LAW
Donald seeks to revoke his consent to the adoptions. However, he has not cited any statute or case which permits him to do so.
Not at all relevant to such issue are two early cases (Erlanger v Erlanger, 102 Misc 236 [1918], affd without opn 185 App Div 888; Matter of Bamber, 147 Misc 712 [1933]) relied upon by Donald, which were decided long before the enactment of the current statutes. In both cases, moreover the adoptions were not granted because, unlike the instant case, there was no compliance with the statutory requirement of a signed agreement to adopt.
This court has been unable to find any decision, in this or any other jurisdiction, which deals with the right of a prospective adoptive parent who, after executing a petition and consent to the adoption, seeks to revoke such consent prior to the signing of the final order approving the adoption. Although our courts under the doctrine of equitable adoption (actually adoption by estoppel) have enforced a written or oral contract to adopt to the extent of decreeing that the proposed adoptive child is a distributee in intestacy (Weinberger v Van Hessen, 260 NY 294; Gavin v Aitken, 258 NY 595; Middleworth v Ordway, 191 NY 404; Healy v Healy, 166 NY 624; Winne v Winne, 166 NY 263; Matter of Mazzeo, 95 AD2d *923 91; Wener v Wener, 35 AD2d 50; Miller v Elliott, 266 App Div 428; Rodriguez v Morris, 136 Misc 2d 103; Matter of Riggs, 109 Misc 2d 644), no court has taken the additional step of specifically enforcing the contract to adopt, i.e., to decree the existence of the parent-child relationship with all the accompanying legal consequences (see, Annotation, Modern Status of Law as to Equitable Adoption or Adoption by Estoppel, 97 ALR3d 347). The absence of any such precedent is not surprising since adoptive parents are invariably eager to complete the adoption proceedings once commenced.
Although our statutory framework makes provision for all proceedings necessary to complete a private-placement adoption (Domestic Relations Law § 115 et seq.), including provision for the denial of such a petition by the court (Domestic Relations Law § 116) and the revocation of a natural parent’s consent (Domestic Relations Law § 115-b [6]), no statute mentions the revocation of a consent, once made and included in the petition to adopt, by one or both of the adoptive parents.
At one time, our courts were permitted to abrogate an adoption on petition of the adopted child or both adoptive parents for cause arising after an adoption had been completed (see, Domestic Relations Law former §§ 118 — 118-c; Matter of Anonymous, 76 Misc 2d 1077; Matter of Anonymous, 8 Misc 2d 155; Matter of Anonymous, 157 Misc 951). These statutes were repealed in 1974. Today, a final order of adoption may be vacated only for fraud, newly discovered evidence or other significant cause arising before the order of adoption was signed (Domestic Relations Law §§ 114, 116 [4]; Matter of Parents of "Nicky” v Dumpson, 81 Misc 2d 132). There is no proof that Elaine fraudulently induced Donald to petition for and consent to the adoptions.
It should be noted that the Legislature has moved more and more towards limiting the right of a natural parent to revoke a consent to an adoption. Section 115-b of the Domestic Relations Law was enacted to reform former statutory and decisional law perceived as unfair to adoptive parents and children in particular and to the institution of adoption generally (see, 1972 NY Legis Ann, at 202-203; Mem from Office of Senate Temporary President, Bill Jacket, L 1972, ch 639). Under the current statute, a natural parent’s consent given before the court is immediately irrevocable (Domestic Relations Law § 115-b [2] [a]). An extrajudicial consent may be revoked within 45 days after execution (Domestic Relations Law § 115-b [3], [6]). But even if revoked within the 45-day *924 limit, such revocation may be given effect only if a court determines that the best interest of the child will be promoted by such revocation (Domestic Relations Law § 115-b [6] [d] [ii]; see, Matter of Sarah K, supra; Matter of John E. v Doe, 164 AD2d 375; Matter of Baby Girl Z., 154 AD2d 471).
These cases recognize that the revocation of a consent by a natural parent immensely compromises the best interest of a child in a continuous home environment. But so does the revocation of a consent by an adoptive parent. If our statutes do not permit the consent of a natural parent to be undone at will, why should the revocation of such a consent by an adoptive parent be allowed? Our law fails to deal with that problem.
Donald’s acts have placed the children in their present setting and he should be financially responsible for their well-being. His change of heart with respect to their adoption should not place him in a better financial position than an unmarried father in a paternity proceeding (Family Ct Act § 511 et seq. [Elaine would not have these children in her custody "but for” Donald’s acts]) or in a better position than a married man who has changed his mind after his wife has been artificially inseminated (Domestic Relations Law §73; Matter of Anonymous, 74 Misc 2d 99).
Regardless of whether this court compels Donald to become the adoptive father of the infants, it appears that he would be required, in another forum, under the doctrine of equitable estoppel, to support them (172 AD2d 317, supra; Wener v Wener, supra; Matter of Karin T. v Michael T., 127 Misc 2d 14; Lewis v Lewis, 85 Misc 2d 610; Anonymous v Anonymous, 41 Misc 2d 886; Gursky v Gursky, 39 Misc 2d 1083).
Nonetheless, in the event that Donald is permitted to withdraw his consent to their adoption, the children will be prejudiced to the extent that their formal incorporation into a family, with the rights that the law confers upon adopted children, will be delayed. Elaine has not requested permission to adopt by herself. Should she make this request, it is questionable whether section 110 of the Domestic Relations Law could be construed to allow Elaine to adopt under her marital circumstances.
This court has given serious consideration to the present and future well-being of Baby Boy C. and Baby Girl O. The possibility that these infants may be injured as a result of these proceedings is a cause for deep concern. Without in any *925 way diminishing the rights of biological parents to the care and custody of their children, described as "an interest far more precious than any property right” (Santosky v Kramer, 455 US 745, 758-759) or the rights of adoptive parents, the welfare of the child is the court’s paramount concern in every adoption proceeding (Domestic Relations Law § 115-b [former (1)] [d] [ii] [now § 115-b (3) (b)]; see, Matter of Sarah K, supra; People ex rel. Scarpetta v Spence-Chapin Adoption Serv., 28 NY2d 185; Matter of Baby Girl W, 151 AD2d 968, lv denied 74 NY2d 613; Matter of Donald U., 105 AD2d 875, lv dismissed 64 NY2d 603; Matter of Jennifer R. C., 130 Misc 2d 461; Matter of Caroline R., 99 Misc 2d 114).
But adoption is solely a creature of statute (Matter of Seaman, 78 NY2d 451, 455; Matter of Malpica-Orsini, 36 NY2d 568, 570; Matter of Eaton, 305 NY 162, 165; Betz v Horr, 276 NY 83, 86-87; Carpenter v Buffalo Gen. Elec. Co., 213 NY 101, 104; Doe v Roe, 37 AD2d 433, 436; United States Trust Co. v Hoyt, 150 App Div 621, 624; Matter of Anonymous, 89 Misc 2d 132, 133) and there is no statute which enables this court to direct specific performance of an adoption agreement.
The dispensation, for "good cause shown”, of the appearance by an adoptive parent before the court (Domestic Relations Law § 115 [9]) cannot reasonably be construed as a legislative intent to authorize a forced adoption where the adoptive father has refused to take the last step required by law to finalize the adoption. The Legislature has not conferred upon our courts the power either to compel a person engaged to be married to take his or her final vows at the altar (notwithstanding a prior promise to marry) or to compel a prospective adoptive parent to take the last step before the court (notwithstanding a prior promise to adopt). Also, to conclude that Donald can be directed to specifically perform his promise to adopt would implicitly accept the concept that a child is no more than a chattel, subject to contract law.
Donald has indicated that he would not participate in raising and nurturing the children if the court declared him to be their adoptive father. There is no reason to doubt the sincerity of that statement or to presume that Donald would do worse, namely, be vindictive towards the children because the adoption was concluded against his will. However, as an adoptive father, he would have the rights of a parent notwithstanding his refusal to accept that role. In the absence of a clear mandate from the Legislature, these rights should not be conferred upon an individual against his wishes. Particularly, *926 not to a man whose behavior throughout these proceedings has clearly demonstrated that he is not fit to be a father to the children.
Accordingly, the joint petitions of Donald and Elaine for the adoption of these children are dismissed without prejudice to Elaine’s right to commence adoption proceedings in the future.