Titone, J.
(concurring). I agree that due process does not require the unraveling of a 10-month-old adoption at the behest of a biological father whose identity was unknown and unknowable at the time the adoption became final, but I cannot agree that in all circumstances "biology alone is not enough to warrant constitutional protection” (majority opn, at 266). Additionally, I cannot agree with the majority’s reliance on the purported fault of this biological father in "failfing] to take any steps to discover the pregnancy or the birth of the child” until after the child was adopted (majority opn, at 259). In my view, the adoption should be left undisturbed despite petitioner’s competing interest in the child not because petitioner is blameworthy, but rather because the strong public policies favoring the finality of adoptions outweigh the interest of a biological father who, through no fault of his own, has been deprived of the opportunity to "manifest and establish his parental responsibility” toward the child (see, Matter of Raquel Marie X., 76 NY2d 387, 409, cert denied sub nom. Robert C. v Miguel T, 498 US 984).
At the heart of my disagreement with the majority is the unrealistic burden that its rationale imposes on the multitude *268 of men who, in this age of sexual permissiveness, have intimate relations with women to whom they are not married. Because of the biological characteristics of the parties to these relationships, it is the women, rather than the men, who are in the unique position to discover whether a pregnancy has resulted. Further, in most instances, it is the women, rather than the men, who hold the exclusive power to decide whether or not the other progenitor is to be informed of the pregnancy’s existence. The man who has not been told of the pregnancy has few, if any, avenues of recourse.
Indeed, although the majority has not hesitated to assign blame to petitioner because of what it terms his "inaction,” it has not even begun to identify just what it is that petitioner might have done to fulfill his responsibilities in these circumstances. Does the majority mean to suggest that all men who engage in sexual intercourse with women to whom they are not married must remain in regular contact with them even after their relationships have terminated in order to ascertain whether there has been a pregnancy? Must they also make inquiries in the community or pursue alternative sources of information in order to definitively rule out the possibility that the relationship may have produced a child?
I would submit, most respectfully, that a rule which places the onus on the man to investigate whether a woman with whom he is no longer intimate has become pregnant is simply out of step with modern mores and the realities of contemporary heterosexual liaisons. In this age of readily accessible birth control devices, men have greatly diminished reason, in most circumstances, to suspect that a woman with whom they have been intimate has become pregnant. Accordingly, there is little to prompt them to pursue their former lovers to satisfy themselves on that point. Moreover, a rule that requires men to foist continued contact on women with whom they are no longer involved overlooks women’s interest in preserving their own privacy after the relationship has been terminated.
Contrary to the majority’s suggestion my conclusion that the law should not hold petitioner accountable for failing to discover his former fiancée’s pregnancy does not lead me to the further conclusion that "the protections of constitutional due process must or should be extended to him under these circumstances” (majority opn, at 265). Although petitioner is innocent of any untoward neglect and, in fact, had a constitu *269 tionally cognizable interest in a parental relationship with his biological child (see, Matter of Raquel Marie X., supra, at 401-402), that interest does not outweigh the State’s countervailing interest in ensuring the finality of adoptions and, thus, it was not entitled to constitutional protection.
The central importance of finality in the adoption process has been recognized by both the Legislature and the courts (see, e.g., Matter of Sarah K., 66 NY2d 223; 1972 NY Legis Ann, at 202-203; Mem from Off of Sen Temp President, Bill Jacket, L 1972, ch 639). While the State must make every effort to protect the rights of biological parents in adoption proceedings (see, e.g., Lehr v Robertson, 463 US 248; Caban v Mohammed, 441 US 380), there also must come a point where the matter is deemed irrevocably closed, so that the parties can go forward with their lives, secure in the certainty that their legal and familial status can no longer be disturbed.
The importance of finality in the lives of the children involved in the adoption process is so obvious as to require little elaboration. One of the most crucial elements of a healthy childhood is the availability of a stable home in which each family member has a secure and definite place. In addition to the stake of the adopted child, the adoptive family is unquestionably adversely affected by any lingering uncertainty about the permanence of the adoption. As one commentator has observed, "[t]he bond, the love, the intense emotion between adoptive parents and the child placed in their home, is created the very moment their dream is fulfilled and a child comes through the door” (Mem from Off of Sen Temp President, op. cit.). Lastly, society has an independent interest in the finality of adoptions, since the adoptive relationship implicates many legal rights of the parties, including the right to inherit and the right to receive certain governmental benefits.
If petitioner’s position were to be embraced by the Court, the critical goal of finality could never be achieved for the substantial number of children whose biological fathers have not been apprised of their existence. Such children — as well as their adoptive families — would be forever relegated to a state of legal limbo in which their familial relationship would remain subject to the possibility that their biological fathers might suddenly learn of their birth and appear to reclaim them. Clearly, such a result is one that cannot be tolerated in a legal system that concerns itself with humane values.
While due-process principles may give unmarried fathers *270 the right to an opportunity to develop relationships with their biological children (see, Stanley v Illinois, 405 US 645; Matter of Raquel Marie X., supra), there is nothing in the State or Federal Constitutions that compels States to protect that right at all costs. To the contrary, the due-process inquiry necessarily entails a sensitive balancing of the biological parents’ interests against ”[t]he legitimate state interests in facilitating the adoption of young children and having the adoption proceeding completed expeditiously” (Lehr v Robertson, supra, at 265).
In situations such as this one, the interests of the biological father are relatively slight, since he has not developed a relationship with the child. On the other hand, his interests cannot simply be disregarded or deemed extinguished, since, unlike the biological fathers in Lehr v Robertson (supra) and Quilloin v Walcott (434 US 246), petitioner had no realistic opportunity to manifest his parental commitment and, accordingly, cannot be treated as though he knowingly relinquished that opportunity.
Nonetheless, petitioner’s interest is not entitled to constitutional protection, since it simply cannot be accommodated without sacrificing the paramount State interest in finality. When the slender interest petitioner has is compared to this very weighty competing interest of the State, we are duty bound to opt for a legal rule that promotes the former, even though that rule may well omit many potentially responsible fathers in petitioner’s position (see, Lehr v Robertson, supra, at 264).*
*271 Contrary to the majority’s assertion, there is nothing in the foregoing analysis that implicates "a mother’s right to privacy” or suggests that disclosure of the biological father’s identity may be compelled in these circumstances (see, majority opn, at 266; cf., Planned Parenthood of Southeastern Pa. v Casey, 505 US —, 112 S Ct 2791). Indeed, I would argue that no law could, or should, be written to prevent women such as Carol A. from making the very personal and human choice to withhold information about their pregnancies from the men whom they know are the biological fathers. Furthermore, in view of these women’s legitimate privacy interests, I would certainly not require the establishment of institutional mechanisms, such as a mandatory notice or disclosure requirement, as means of accommodating the interests of biological fathers. Those interests are simply not substantial enough to warrant such extreme measures.
The third societal interest that the majority identifies (majority opn, at 266) — efficiency—stands on an entirely different footing. While perhaps desirable, efficiency is simply not, by itself, the kind of goal that warrants the solicitude we might give to the privacy rights of unwed mothers or the finality of adoptions. Accordingly, I would willingly acknowledge that, as the majority has accurately observed, I might well conclude that, in the proper circumstances, efficiency in the system alone is not a sufficiently important end to overcome a biological tie.
In sum, petitioner’s situation is an unfortunate one, since, through no real fault of his own, he has been deprived of "the blessings of the parent-child relationship” and even the opportunity of developing such a relationship (Lehr v Robertson, supra, at 262). However, his dilemma was created not by any institutionalized mechanism or unrealistic legal barrier imposed by the State, but rather by Carol A.’s personal — and perfectly understandable — decisions to keep her pregnancy secret from him and to surrender their child without disclos *272 ing his identity. In these circumstances, the interests petitioner may have had in his role as a biological father are more than outweighed by society’s overriding interest in ensuring the finality of his child’s adoption. For that reason, and that reason alone, I conclude that petitioner’s interests are not entitled to due-process protection, and, accordingly, I concur in the Court’s decision to affirm.
Chief Judge Wachtler and Judges Kaye, Hancock, Jr., and Bellacosa concur with Judge Simons; Judge Titone concurs in result in another opinion; Judge Smith taking no part.
Order affirmed, with costs.

 The difference between the majority’s position and my own is not simply a matter of how the biological father’s "interest” is characterized or labelled (see, majority opn, at 265-266). Rather, we differ on the more fundamental question of whether the father’s interests arising from his biological connection, however they are characterized, were completely extinguished once the State acted by proceeding with the adoption. The majority’s conclusion that they were seems at odds with the Court’s statement in Matter of Raquel Marie X. (supra, at 402) that "where a child is placed for adoption before any real relationship can exist,” an unwed father has some continuing interest, although that interest "can be lost entirely, or greatly diminished in constitutional significance, by failure to timely exercise it or by failure to take the available legal steps to substantiate it.” As the Supreme Court has recognized on several occasions (e.g., Lehr v Robertson, 463 US 248, supra; Quilloin v Walcott, 434 US 246, supra; Stanley v Illinois, 405 US 645, supra), the question is not whether the biological father has a constitutionally cognizable interest, but rather whether, by virtue of his conduct in relation to the child as well as the other relevant circumstances, his interest has *271 become sufficiently weighty as to be deserving of constitutional protection. Like the majority, I would answer that question in the negative here, where adoption proceedings had already begun and, in fact, been finalized before petitioner learned of the child’s existence and came forward. However, unlike the majority, I would not go so far as to assert the sweeping conclusion that biology alone can never be enough to warrant some constitutional protection, regardless of the context or the consequences (majority opn, at 266). There is simply nothing in the relevant case law that requires such an extreme position.