■ In the Matter of the Adoption of FEMALE INFANT B. MR. "ANONYMOUS" et al., Respondents; KHATUNA B., Appellant. [857 NYS2d 95]—

Order, Family Court, New York County (Mary E. Bednar, J.), entered January 19, 2007, which awarded custody of Female Infant B. to petitioners, unanimously affirmed, without costs.

Female Infant B., the subject child of this private placement adoption, was placed in the care of petitioners, the adoptive parents, with whom she has continuously lived, immediately following her birth in November 2003. Nine days after the infant's birth, a surrender agreement was executed by respondent, the biological mother, and, on January 30, 2004, petitioners filed a petition for adoption. Respondent was served approximately 26 months later after a search to ascertain her whereabouts. On May 15, 2006, respondent filed a document stating that she was revoking her consent to the adoption, and she subsequently filed a writ of habeas corpus seeking the return of her child, which the court converted into an order to show cause. At a hearing on the order to show cause, respondent and the adoptive mother testified, as did the doctor who delivered Infant B. and the notary public who witnessed the execution of the surrender agreement. A friend of respondent was called as a rebuttal witness.

At the time of this proceeding respondent was a 38-year-old immigrant from the Republic of Georgia. She worked as a home health aide, and spoke at least some English. She came to the United States on a tourist visa in 1998, leaving behind her husband and three children, ages 1½, 2½ and 3½. Her Georgian husband divorced her in 2001. She maintains contact with her children and sends money to her relatives in Georgia

for the children's care. She remained in the United States after her tourist visa expired; she married a United States citizen in March 2001.

Respondent learned in September 2003 she was pregnant as the result of an extramarital relationship and sought an abortion, but was unable to have one since she was seven months pregnant. A worker at the clinic where she had sought treatment arranged a meeting with the adoptive mother, a colleague whom the worker knew was trying to adopt a child with her husband.

Because respondent did not want her husband to find out she was pregnant, petitioners found her an apartment in Manhattan. Respondent told her husband that she had found a job in New Jersey taking care of an older woman. Despite her later claim that the arrangement with petitioners was to be temporary, respondent admitted at the hearing that she knew petitioners intended to adopt her baby.

Petitioners helped respondent find an obstetrician who spoke Russian and also came from Georgia. When respondent gave birth in November 2003, petitioners brought an unsigned "adoption document" to the hospital. Respondent, however, would not sign it, stating that "she wanted to confer with her new attorney that she had just found out of the Russian phone book in the hospital room that morning." When mother and baby left the hospital, however, petitioners took respondent to her apartment in Manhattan and took the baby to their home.

Nine days later, the parties met at respondent's apartment in Manhattan, where they signed the surrender agreement before notary public Donald Zuniger. Zuniger testified that he reviewed the document with respondent; he specifically asked her to acknowledge to him that she understood what she was signing, and she told him that she did. Zuniger testified that respondent was upset and crying, but that he heard her tell the adoptive mother she "was worried that her boyfriend would find out about the adoption and that it wouldn't be confidential." There were no discussions as to any conditions attached to the arrangement. Zuniger did not see any threats made to respondent or any reluctance on respondent's part when she signed the agreement.

Respondent testified that between the time Infant B. was born and the day she signed the surrender agreement, petitioners threatened her with deportation on the ground that her marriage was "fake." As of the date of the signing of the surrender agreement, however, respondent had completed the process of obtaining her green card and was waiting for its receipt.

She admitted at the hearing that when she signed the agreement she knew she would have no rights to the baby if she did not revoke or change her mind within 40 or 45 days.

On February 3, 2004, petitioners and respondent met at a restaurant in Manhattan. At first, the meeting was friendly; respondent held Infant B. for about two minutes while her friend Svetlana, who had accompanied her to the meeting, took pictures. Then, respondent testified, the mood of the meeting changed, and the adoptive mother again threatened her with deportation. Respondent claimed that she was frightened and did not know her legal rights. After that occasion, respondent called petitioners' home "many times," but once they heard her voice they would hang up. She testified that she also went to petitioners' apartment building "many times," but only went to the apartment door twice, when she left balloons on the door for the child on her first and second birthdays.

By contrast, the adoptive mother testified that petitioners never received anything from respondent, such as balloons, cards, letters or presents. Other than the meeting on February 3, 2004, respondent never asked to see the child again. The adoptive mother testified that at that meeting respondent began to threaten that she would kidnap the baby unless petitioners helped her get her other children out of Georgia. With regard to telephone calls, the adoptive mother testified that there may have been a "few messages," but after the "unnerving" meeting, she told respondent that petitioners would not take any more hostile telephone calls and would only meet respondent with an attorney present.

After the hearing, the court credited the adoptive mother's testimony that respondent intended to give up the child for adoption, but found that the surrender agreement was invalid because some of the requirements of Domestic Relations Law § 115-b had not been met. These included the absence of 18-point type, which the court deemed insignificant, and, more substantively, the failure to give notice that if petitioners were to contest respondent's revocation, Infant B. would not necessarily be returned to respondent and a hearing could be directed as to the best interests of the child. The court also found a significant defect in the document's failure to advise respondent of her right to an attorney and counseling, as required by Domestic Relations Law § 115-b (4) (a) (v).

The court concluded, however, that a best interests hearing was not required because there was sufficient credible testimony to make a finding of abandonment pursuant to Domestic Relations Law § 111 (2) (a). In making that finding the court

concluded that respondent's contacts with the child in the months after the delivery were insubstantial and ineffectual, and that she had failed to offer financial support or take timely legal action to oppose the adoption.

As the parties agree, and Family Court found, the surrender agreement did not comply with Domestic Relations Law § 115-b. Aside from the improper-sized type, which, if it were the only deficiency, could be overlooked, the document failed to advise respondent of her right to an attorney and to counseling, or to notify her that even if she revoked her consent, and petitioners objected, she would not necessarily regain custody of the child.

While "[n]ot every violation of Domestic Relations Law § 115-b will necessarily invalidate a consent" (*Matter of Gabriela*, 273 AD2d 940, 940 [2000]), the substantial defects here include ones designed to ensure that respondent was "fully informed of [the] consequences" of the consent (*Matter of Sarah K*, 66 NY2d 223, 240 [1985], *cert denied sub nom. Kosher v Stamatis*, 475 US 1108 [1986]; *see also Matter of De Filippis v Kirchner*, 217 AD2d 145 [1995]). To be sure, she evinced an understanding that she only had 40 or 45 days to revoke her consent to the adoption. It is not clear, however, that she also was aware that even a revocation within 45 days would not guarantee the return of her baby, or that she might first have to prevail at a hearing.

Nevertheless, we need not determine whether these defects rendered the surrender agreement invalid as we conclude that respondent's inactivity for 30 months estopped her from opposing the adoption. Respondent refused to sign the surrender agreement at the time of the child's birth because she claimed she wished to consult with an attorney. She did, however, sign the agreement nine days thereafter. During the intervening time period, the baby had resided with petitioners, and the child has lived with them ever since. Respondent made no attempt to have the child returned to her, either during the nine days before she signed the agreement or during the period prior to the date the petition was served on her on April 6, 2006, 2¹/₂ years after she signed the surrender agreement. Although she testified that she conferred with an attorney, she took no subsequent steps to revoke her consent, or even to seek visitation. As noted, respondent also admitted that she knew she had 40 to 45 days from the signing of the surrender agreement to revoke her consent.

"Equitable estoppel is commonly invoked in matters of paternity, child custody, visitation and support . . . [but] will be applied only where its use furthers the best interests of the

child or children who are the subject of the controversy" (*Matter of Charles v Charles*, 296 AD2d 547, 549 [2002]). It is clearly not in the child's best interests to be removed from the only parents she has ever known.

As has been observed, "[t]he Legislature enacted Domestic Relations Law § 115-b to provide a legal framework within which future adoptions can be undertaken with reasonable guarantees of permanence and with the humane regard for the rights of the child, the biological parents and the adoptive parents" (*De Filippis*, 217 AD2d at 147). Although the surrender agreement is not in compliance with all of the statutory requirements, the same public policy concerns are no less applicable. Permitting respondent, who has not contributed any support for the child, to seek a revocation at such a late date does not further these policy goals. Furthermore, as in *De Filippis*, the surrender agreement here was executed after the birth of the child, when respondent had sufficient opportunity to reflect on whether she wished to cede her parental rights. As was noted in *De Filippis*, a prebirth consent is less likely to be the result of a fully deliberative act.

In sum, the 30 month hiatus in seeking a revocation, the failure to provide support and the best interests of the child, compel the conclusion that respondent is estopped from challenging the surrender agreement. Concur—Saxe, J.P., Sweeny, McGuire and Acosta, JJ.