Bellacosa, J.
(dissenting). I agree with Judge Levine’s majority articulation of the applicable principles of the law, including that judicial imposition of parentage by adoption on an objecting individual is a "drastic” and "unprecedented” matter. However, I disagree with the application of the governing principles to this exceptional case in which that extraordinary equitable relief should be upheld. I would affirm the order of the Appellate Division.
L
This case is about judicial completion of a joint adoption application set in motion by appellant and his wife in Surrogate’s Court affecting the status and well-being of two children, now aged six, who are the subjects of this proceeding and appeal. Baby Boy C., born in the Philippines in July 1987, lived under the custody and care of appellant initially jointly with the wife after being admitted into the United States in February 1988. Baby Girl O., born in Philadelphia, Pennsylva *107 nia, was placed in the physical custody of the putative adoptive parents on May 13, 1988, just two days after her birth. The appellant, putative adoptive father, was described by a nurse’s aid as having significant contact with Baby Boy C. in his home for approximately nine months.
Seven months after Baby Boy C. arrived in this country and five months after custody of Baby Girl O. was given to the adoptive parents, they filed their 1988 joint adoption petition in Surrogate’s Court, New York County. The husband and wife, though more lately engaged in a bitter public divorce action, have remained jointly responsible for the care, welfare, maintenance and education of the children. The duty and responsibility to support the children sprang not only from filing the joint adoption petition, but also, in the case of Baby Boy C., from the citizen naturalization petition in which appellant certified under penalty of perjury that, 'T will care for the beneficiary of this petition properly if the beneficiary is admitted to the United States”. Neither child has known anyone but these two people as their parents.
In 1990, appellant commenced a divorce action against the putative adoptive mother in whose sole custody the youngsters have been after appellant separated from the family. Appellant did not make a formal motion in Surrogate’s Court to revoke his consent to the adoption or to discontinue the adoption proceeding until November 1990.
At the adoption hearing in 1991, Surrogate Roth rejected appellant’s claim that he did not understand the adoption petition and found that "[t]he record [was] devoid of any showing of fraud or misrepresentation” (153 Misc 2d 916, 920). She relieved appellant, however, of adoption responsibility under prevailing principles of law. The Appellate Division agreed with the Surrogate’s essential factual findings, but held that it was in the best interest of the children for the joint adoption to be finalized. That Court found that appellant made "firm commitments and [took] deliberate steps in furtherance of these adoptions” (189 AD2d 382, 387). The findings of both courts have evidentiary support in the record, but the result reflected in the Appellate Division decision is legally warranted and correct.
In the effort to adopt Baby Boy C., appellant caused that infant to be moved halfway around the world to enter appellant’s home by reason of his inducements. Appellant made a conceded, formal promise to his wife, to the child, to the *108 Surrogate’s Court, and to the United States Government that he would care for Baby Boy C. if the child were admitted to the United States, ultimately for adoption by him. With Baby Girl O., appellant paid the birth mother’s medical expenses and caused the infant to be placed in his own and his wife’s joint custody, just two days after birth. In reliance on appellant’s promise to adopt, Baby Girl O.’s biological mother executed an irrevocable consent, surrendering her parental bond and rights.
The majority, nevertheless, concludes that this is not an "exceptional” case qualifying for the invocation of equitable relief. Two reasons are advanced for declining to exercise equitable remedies (majority opn, at 102, 102-103). First, significant weight is given to the fact that the putative adoptive mother, as "an adult married person who has been living separate and apart from * * * her spouse [appellant] for at least three years,” may adopt alone (Domestic Relations Law § 110). Second, the children, regardless of adoption, are found to enjoy potential legal recourse against appellant for economic support. These factors may be relevant, but they are not dispositive in this case. Flexible judicial Chancellor’s powers emerged as the historical outgrowth in Anglo-American jurisprudence against the rigidity of the "at law” forms of relief (see, 1 Holdsworth, History of English Law, at 395-476 [6th ed]; Adams, The Origin of English Equity, 16 Colum L Rev 87 [1916]). The words of this Court’s premiere jurist and instructor in law and equity, Chief Judge Benjamin N. Cardozo, captures the essence of a Chancellor’s role in adjudicating a case such as this: "[l]et the hardship be strong enough, and equity will find a way, though many a formula of inaction may seem to bar the path” (Graf v Hope Bldg. Corp., 254 NY 1, 13 [dissenting opn]). I would thus affirm the Appellate Division’s direction for joint adoption and then let nature and still pending related judicial proceedings take their course.
IL
The paramount concern of the courts in any adoption proceeding is the welfare of the child (see, Matter of Robert Paul P, 63 NY2d 233, 237; Domestic Relations Law § 116). Undeniably, irreversible actions were triggered by appellant and undertaken by others directly affecting these children, their welfare and their right to a promised parental bond. The infants were transported as to place and transformed as to *109 custodianship. There was inducement, promise and detrimental reliance of the most profound nature. Appellant is directly responsible for the irreversible changes of position which has kept these children dangling at extreme risk and disadvantage socially, psychologically, as well as financially. Indeed, nearly six years have passed since appellant extended his welcoming hand. His about-face and rejection has put these two children into an extended parental limbo. As apparent pawns in the marital rupture between this appellant husband and his wife, the children have been already irretrievably deprived of a substantial portion of the promised parental relationship. The clock ticks and years pass as their finite childhood unfolds. Detrimental reliance and irretrievable change of position should, at the very least, foreclose appellant’s withdrawal from the pending adoption proceeding he jointly started (see, Nassau Trust Co. v Montrose Concrete Prods. Corp., 56 NY2d 175,184).
Equity should be the forum for remedying the unique harm inflicted by appellant on these children, because money damages at law would be inadequate (see, Matter of Burke v Bowen, 40 NY2d 264, 267; 3 Pomeroy, Equity Jurisprudence §§ 1401, 1402, 1407 [1st ed]). No money damages can compensate for the deprivation of the promised parental nurturing all these years and now permanently. Divesting the infants of their natural parental ties forever in return for a seductive promise to substitute a new family tie should have proportionate consequences. That irrevocable change in the children’s parent-child status leaves them without family security, lineage or pedigree. Appellant’s evidently mean-spirited change of mind reflects the quintessential change in position meriting equitable judicial intervention because there is no possibility of return to status quo ante. In this case, no secure status quo in futuro is even possible.
The acceptance of an obligation intuitively, instinctively and freely rooted in one’s own acts, is the soul of equity (see, Wood v Lucy, Lady Duff-Gordon, 222 NY 88, 90-91). Reinforcing the need for equitable intervention is appellant’s formalized actions by part and substantial performance, in solemnly starting a joint judicial proceeding to adopt. We have said that "[c]ourts do not arbitrarily refuse specific performance of an agreement * * * when equity seems to demand that the parties be compelled to carry out such agreement * * *. Especially is this the rule, almost of right, where one of the parties has partly performed or changed * * * position in *110 reliance on the contract, and common justice forbids that the other party should, on some technicality” (Harris v Shorall, 230 NY 343, 347-348 [emphasis added]).
The mere fact that appellant’s spouse may singly pursue and qualify for adoption does not change the legal linkage which has always existed between the rights and responsibilities of the appellant promisor to the directly affected children (see, Domestic Relations Law § 110 ["(a)doption is the legal proceeding whereby a person takes another person into the relation of child and thereby acquires the rights and incurs the responsibilities of parent”]). This statute does not speak only to financial support or security, but to parental relationship, expectations and, in this case, entitlement to special relief tailored to the detrimental reliance and irreversible changes of position wrought by appellant. In these extraordinary circumstances, this Court must be concerned not only with the material maintenance of the children, but also with their physical, mental, moral and civic development.
Additionally, this case is not simply a matter of money. The potentiality of child support squeezed ultimately out of appellant is not an adequate remedy at law or a just solution for this double disaster examined in its full human dimension. Nor is this case about remedying lost intimacy. I fully recognize that equity cannot command love or filial feelings. But it can redress a betrayal of promised parentage which deprives these children of their familial identity and mooring in the now and their full dimensional security in the future. The remedy I propose, as found by the Appellate Division, seeks to correct deficits that are more than money, yet less than intimacy, which are nevertheless tangible and remediable within the prudential and flexible range of equity’s traditional beneficial reach.
Weinberger v Van Hessen (260 NY 294) is instructive. There, the defendant induced an infant’s mother to transport her child to America and surrender custody, care and control based on a promise to support the child and direct his education and control his religious and moral upbringing. Two years after accepting custody of the child, the caregiver changed his mind. The Court affirmed the determination of the Appellate Division — as I propose we do here — which then denied the care-promisor’s motion to dismiss the infant’s claim in equity for specific performance. The Court noted that the agreement concerned not only the child’s custody, "but also * * * the mental, moral and religious training of the child” *111 (id., at 298). While the agreement there did not deal directly with formalized adoption, the essence of the arrangement did not differ essentially from the transformation effected on the two infants in the instant case. Here, the Court is presented with a modern variation of the Weinberger dilemma. The wisdom found in that case provides guidance here to a prudent and supportable result — affirmance of the Appellate Division’s direction for a grant of the joint adoption petition.
IIL
Equity and the New York Surrogate’s Court — the forum renowned as the special haven of orphans and surviving spouses — are not bereft of the parens patriae power to shape the remedy for appellant’s wrongs (see, SCPA 201, 202, 209; NY Const, art VI, § 12 [d], [e]). Appellant’s misconduct under the unique circumstances of this extraordinary case need not be excused because of fretting over open-ended precedential implications and potentialities. Pomeroy proclaimed that "Equitable remedies * * * are distinguished by their flexibility, their unlimited variety, [and] their adaptability to circumstances. * * * [T]he court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties” (1 Pomeroy, Equity Jurisprudence § 109 [1st ed]; see also, Matter of Lipschutz [Gutwirth] 304 NY 58, 63). Individualized judicial discretion and prudence are the proper limits and checks against overgeneralized remedies that would flow from threatened floodgated repercussions.
While I fully appreciate the concerns expressed by my colleagues that the legal and judicial imputation of parentage, over objection, represents a grave step, this case qualifies, in my view, for Pomeroy’s and Cardozo’s most delicate, refined and exceptionally exercised implementation of the equitable writ. Appellant’s conduct and the children’s well-being, in all dimensions of their fragile existence, are what equity’s promise is designed to correct. Thus, I would affirm the Appellate Division’s prudent and correct resolution of this profoundly wrenching controversy.
*112 Chief Judge Kaye and Judges Simons and Ciparick concur with Judge Levine; Judge Titone concurs in result in a separate opinion; Judge Bellacosa dissents and votes to affirm in another opinion; Judge Smith taking no part.
Order reversed, etc.