# In the Matter of Baby Boy C. and Another, Infants.

First Department, April 15, 1993

## APPEARANCES OF COUNSEL

*Mara T. Thorpe* of counsel, New York City *(Morrison Cohen Singer & Weinstein,* attorneys), for petitioner-appellant.

*Lawrence W. Pollack* of counsel, New York City *(Phyllis B. Levitas* with him on the brief; *Migdal, Pollack, Rosenkrantz & Sherman,* attorneys), for petitioner-respondent.

*Kevin C. Fogarty,* Guardian ad Litem, Jamaica, for infants.

## OPINION OF THE COURT

WALLACH, J.

In many private-placement adoption cases the issue is commonly whether the birth parent has given proper consent, and whether, in the best interests of the child, that consent can legally be revoked (Domestic Relations Law § 115-b [6]). Here we are presented with the apparently novel question whether the prior consent of a prospective *adoptive* parent can be revoked, thus nullifying the pending petition for adoption.

The legislative scheme creates a two-stage proceeding for private-placement adoptions in this State. In the first stage the court orders a thorough, independent investigation into the bona fides of the adoptive parents, as well as the history and health of the adoptive child (Domestic Relations Law § 116 [3]). The investigation of the adoptive parents includes their marital and family status and history; their physical and mental health; their property and income; the compensatory arrangement with respect to the private placement; any complaints or proceedings against the adoptive parents involving child abuse, neglect, abandonment or delinquency; and any other relevant facts relating to their familial, social, religious, emotional and financial circumstances. After compliance has been certified, the second stage involves the actual issuance of an order of adoption to the adoptive parties before the court. At this point the key parties are to appear before the court for "examination" (Domestic Relations Law § 115 [3]). However, where all the necessary documentation has been certified in

the record, the court may dispense with the requirement of a personal appearance by any of the key parties, including an adoptive parent, for good cause shown (Domestic Relations Law § 115 [9]). Such was the situation presented before the Surrogate herein.

Petitioners Elaine and Donald* were married in 1969, she being 32 years his junior. Although they were divorced shortly thereafter, they continued to live together, and had a daughter of this union in 1972. They separated amicably in 1976, but were reunited seven years later, when Donald suffered a stroke. As Elaine nursed him back to health, Donald raised the prospect of remarriage, to which she consented only after he agreed to fulfill her desire to have more children by pursuing adoption. After the couple re-exchanged marriage vows in 1983, they acquired a townhouse in Manhattan, but Donald later had to rent a separate apartment because he still could not manage the stairs. Together, they searched the world for a suitable adoption, meeting with lawyers and visiting adoption agencies as far away as Hong Kong. Finally, in 1987 Elaine was referred to a child care agency in the Philippines, for a contact with Baby Boy C. Donald, who was in Australia at the time, gave his consent. The child was brought to the United States by Elaine in early 1988, upon Donald's petition to the Department of Justice, under the Immigration and Nationality Act (see, 8 USC § 1151 [b]), to classify the infant orphan as an immediate relative for whom he promised to provide care. Adoption proceedings were commenced in Surrogate's Court under the special provisions of Domestic Relations Law § 115-a. Baby Boy C. was brought to the townhouse, and was later christened in the presence of the petitioning adoptive parents and their biological daughter and friends.

At about the same time, petitioners made contact with a pregnant woman in Philadelphia who agreed that she would place her nascent child with them for adoption. Donald agreed to pay the birth expenses, and newborn Baby Girl O. was brought to New York by Elaine in June 1988.

Petitioners had purchased two contiguous apartments on Park Avenue, and were in the process of renovating. In the meantime, there was visitation between Donald and the children, although petitioners disagree over the degree of regularity of the visits. A nurse's aide residing with Donald through

---

* These are the fictitious names ascribed by the Surrogate.

the fall of 1988 confirmed that Elaine would visit her husband at least once almost every day, prepare his dinner and stay with him until late in the evening. After Baby Boy C. arrived, Elaine would bring the child along about three or four times a week, and after Baby Girl O. arrived, she was also brought along on occasion. Donald was able to smile and wave at, and communicate briefly with, the boy, who by this time was a crawler, but his oral communications were limited due to his residual aphasia.

Petitioners' attorney spent several months preparing the formal adoption papers, and on November 21, 1988 petitioners jointly (but not in each other's presence) signed six separate documents—a five-page petition for adoption, a verification, and a one-page notarized agreement of adoption, for each of the infants. Although Donald would later contend that he did not understand what he was signing, each of his signatures was entered, in the presence of petitioners' counsel, on a line under which was typed the words "Adoptive father". The documents were filed in Surrogate's Court two days later. Shortly thereafter, Donald refused to admit Elaine to his apartment, and the parties became estranged.

Sensing that Donald would now balk at completing the adoptions, Elaine retained her own attorney and moved to dispense with Donald's appearance at stage two. Donald then cross-moved to revoke his consent and discontinue the proceedings. When Donald then commenced a divorce action in Supreme Court, Elaine obtained an order for child support which, by appellate ruling, extended to both the adoptive children. Elaine has since been appointed temporary guardian for the children.

Before rendering her decision, the Surrogate made two important findings. First, she found that Donald had knowingly, intentionally and consensually joined in the adoptive proceedings, and that he had been mentally competent to participate throughout the process. Second, the court found—and it is not disputed herein—that Elaine was a fit and eligible mother for these children. But the court denied Elaine's request to proceed with the adoptions in Donald's absence, holding that the statutory "good cause shown" (Domestic Relations Law § 115 [9]) "cannot reasonably be construed as a legislative intent to authorize a forced adoption where the adoptive father has refused to take the last step required by law to finalize the adoption." (153 Misc 2d 916,

925.) We disagree, and hold that the statute does indeed allow for such procedure in these unique circumstances.

Where the trial court went astray was in its discussion of Donald's paternal "rights" under the adoptive scheme. More properly, the point at issue is paternal "obligations", not rights. The purpose of a court-ordered examination of petitioners at the threshold of finalizing an adoption is to pass upon their suitability as adoptive parents. At this point, the only parties with "rights" that need protecting are the biological parents who are *giving up* the child for adoption, and, of course, the child itself. Historically, the intent of this legislative scheme has been to assure that the biological parent has made an informed, well-considered decision to relinquish parental rights *(see, Matter of Sarah K.,* 66 NY2d 223, *cert denied* 475 US 1108; *People ex rel. Anonymous v Anonymous,* 139 AD2d 189, 192-193). A review of cases involving similar legislation all across the country reveals an invariably consistent theme. *(See, e.g.,* Annotation, *Right of Natural Parent to Withdraw Valid Consent to Adoption of Child,* 74 ALR3d 421.)

On the threshold question, we hold that the New York statute is broad enough to encompass a review of whether consent by a petitioner can be revoked at this stage of proceedings. Domestic Relations Law § 115 (9) grants the court discretionary authority to dispense with the personal appearance of an adoptive parent, for good cause shown. Whether the standard for good cause has been met sufficiently to dispense with Donald's appearance is, of course, a factual determination, complicated by his expressed desire to withdraw consent.

We agree with the Surrogate's factual findings. Donald's actions in bringing Baby Boy C. halfway around the world, his petitioning for the boy's immigration without regard to alien quotas, and his commitment to pay the birth expenses for Baby Girl O., all at a time when he was already recovering from a stroke, clearly established his early intention to proceed with these adoptions. Elaine's fitness to be an adoptive mother is unchallenged, and indeed, the passage of time has only solidified the bonding between mother and children. But the ability to nurture adopted children was but one of many factors considered at stage one. The investigation had already revealed that owing to Donald's physical condition, his personal involvement in raising the children would necessarily be limited; however, his financial ability and commitment to their upbringing—another crucial factor—was evidently found

to be unaffected by his physical debilitation. It is this support factor, one of the pillars on which adoption must be based, that is at issue here.

The best interests of the children clearly called for these adoptions to be finalized under the plans mapped out jointly by petitioners more than three years ago. Certain irreversible actions were undertaken as a result of those plans. Not only did Donald make firm commitments and take deliberate steps in furtherance of these adoptions, but Elaine also took steps in reliance thereon. Withdrawal of his commitments at this stage would redound to the detriment of both Elaine and the children. Regardless of Donald's motive in trying to derail those plans on the eve of realization, we hold that his concrete actions in furtherance of his implied promises effectively estopped him from revocation at this late date *(Wener v Wener,* 35 AD2d 50).

The doctrine of equitable estoppel is applicable in determining the best interests of children *(Michel DeL. v Martha P.,* 173 AD2d 308), especially where the party to be estopped has placed the children in an extraordinary situation where their welfare is in jeopardy *(Matter of Boyles v Boyles,* 95 AD2d 95). Indeed, in such circumstances the burden shifts to the party seeking to overcome the doctrine *(Matter of Sharon GG. v Duane HH.,* 95 AD2d 466, *affd* 63 NY2d 859). Despite his last-minute change of heart, Donald has failed to sustain that burden.

Accordingly, the order of the Surrogate's Court, New York County (Renee R. Roth, S.), entered March 26, 1992, should be reversed, on the law, without costs, Donald's appearance for examination should be dispensed with, and the petitions should be granted for these adoptions jointly by petitioners.

SULLIVAN, J. P., ROSENBERGER, ROSS and RUBIN, JJ., concur.

Order, Surrogate's Court, New York County, entered March 26, 1992, reversed, on the law, without costs, examination dispensed with, and the petitions granted for these adoptions jointly by petitioners.