84 N.Y.2d 91 (1994)
638 N.E.2d 963
615 N.Y.S.2d 318
In the Matter of Baby Boy C. and Another, Infants.
Court of Appeals of the State of New York.
Argued March 24, 1994.
Decided June 14, 1994.
Alan M. Dershowitz, Nathan Z. Dershowitz, Victoria B. Eiger, Amy Adelson, Michael R. Schneider, of the Massachusetts Bar, admitted pro hac vice, and Migdal, Pollack, Rosenkrantz & Sherman, New York City (Lawrence W. Pollack of counsel), for appellant.
Morrison Cohen Singer & Weinstein, New York City (Mara T. Thorpe of counsel), for respondent.
Kevin C. Fogarty, guardian ad litem, Jamaica, for Baby Boy C. and another, infants.
Chief Judge KAYE and Judges SIMONS and CIPARICK concur with Judge LEVINE; Judge TITONE concurs in result in a separate opinion; Judge BELLACOSA dissents and votes to affirm in another opinion; Judge SMITH taking no part.
*96 LEVINE, J.
On this appeal, we review an order of the Appellate Division granting joint adoption of two children by a married couple despite the refusal of one of the spouses to appear for examination before the Surrogate's Court in accordance with statutory requirements and his attempt to withdraw from the proceeding and revoke his agreement and consent to the adoption.
Appellant and respondent are husband and wife. They initially married in 1969, divorced shortly thereafter but continued for a time to live together. A child was born of this union in 1972. A period of physical separation followed. After appellant suffered a debilitating stroke in 1983, the couple reconciled and then entered into a second marriage in August of that year. At the time of their remarriage, appellant was 72 years old and respondent was 40. Concededly, appellant is a highly successful entrepreneur and has amassed a considerable fortune.
Over the ensuing years appellant and respondent made various joint and individual efforts to find a child for them to adopt. In early 1988, respondent was able to obtain Baby Boy C., an abandoned child, from a child care agency in the Philippines. In order to facilitate Baby Boy C.'s immigration to the United States, appellant executed a petition to the United States Department of Justice to classify the child as an immediate relative, in which appellant certified that he would "care for the beneficiary of this petition properly if the beneficiary is admitted to the United States".
During the same time frame that the parties were obtaining custody of Baby Boy C., respondent was put in contact with a pregnant woman in Philadelphia, Pennsylvania, who wished to place her baby for adoption at birth. The woman gave birth to Baby Girl O. in May 1988, appellant having paid the woman's birth expenses, and respondent brought Baby Girl O. to New York City the following month.
In November 1988, appellant and respondent filed in Surrogate's Court, New York County, joint petitions for the adoptions of Baby Boy C. and Baby Girl O. containing the parties' consents to adopt the children. They also submitted duly *97 executed and acknowledged agreements of adoption. About a month later, however, appellant and respondent again became estranged. During the months that followed, the remaining statutory requirements of stage one of the private-placement adoptions of the two children were essentially fulfilled (see, Domestic Relations Law § 116 [2]), including the appearance and consent of Baby Girl O.'s biological mother (Domestic Relations Law § 115 [3]), the investigation and report of a disinterested person regarding the adoptive parents' history, physical and mental health and financial circumstances (Domestic Relations Law § 116 [3]) and the completion of the six-month waiting period from the filing of the petitions for adoption (Domestic Relations Law § 116 [1]).
Appellant, however, failed to appear before the Surrogate for examination in order to finalize the adoptions (see, Domestic Relations Law § 115 [3]) and he commenced an action against respondent for a divorce. Respondent moved pursuant to Domestic Relations Law § 115 (9) to dispense with appellant's appearance for examination by the Surrogate's Court in the adoption proceeding. Appellant appeared in response to the motion and signified his unwillingness to adopt the children. In November 1990, appellant formally moved to revoke his consents and agreements of adoption and to discontinue the proceedings.
After a trial on all outstanding factual issues, Surrogate's Court rendered a decision dismissing the joint adoption petitions without prejudice to the right of respondent to commence an adoption proceeding in the future (153 Misc 2d 916). The court found that, despite appellant's protestations to the contrary, he had knowingly and willingly participated in the procurement of Baby Boy C. and Baby Girl O. for purposes of their adoption (in accordance with representations he made to respondent to induce her to remarry him) and that he competently and intentionally executed the consents and agreements of adoption of the two children. The Surrogate also found that the children were emotionally bonded to respondent as their mother and that she was completely fit to fulfill the parental role and should retain custody in the children's best interests.
The Surrogate also found that the children would likely be prejudiced if appellant were permitted to revoke his consents and agreements of adoption in that, under Domestic Relations Law § 110 as then in effect, respondent, as an adult married *98 person, could only adopt the children independently of her spouse if she were living apart pursuant to a judgment of separation or a formally executed separation agreement (Domestic Relations Law former § 110). Thus, the permanent status of Baby Boy C. and Baby Girl O. as legal children of respondent would have remained contingent upon appellant's obtaining a divorce in the contested matrimonial action pending between the parties or the parties' entering into a separation agreement. The Surrogate expressed her regret that, thus, "these children are apparently being used as bargaining chips in the pending matrimonial action" (153 Misc 2d, at 922).
Nonetheless, the Surrogate felt compelled to dismiss the joint petitions. The court reasoned that, because adoption is solely a creature of statute, express statutory authorization would be required before a court could decree specific performance of an agreement of adoption against the will of a prospective adoptive parent who had a change of heart before the finalization of the adoption. The court was unable to discern any such statutory authorization for a forced adoption in Domestic Relations Law § 115 (9), authorizing the court to dispense with the statutory requirement of the appearance of an adoptive parent for examination based upon a showing of good cause. The court concluded that this rather innocuous provision could not have been intended by the Legislature to cover such a momentous result as permitting a court to confer the full range of parental rights upon someone unwilling to accept, and, in this case, clearly unfit to exercise, them.
The Appellate Division reversed (189 AD2d 382). It held, first, that appellant could not effectively exercise an absolute veto over the finalization of the adoptions of Baby Boy C. and Baby Girl O. by the simple expedient of refusing to make the requisite appearance before the adoption court pursuant to Domestic Relations Law § 115 (3). The Appellate Division pointed to the authority granted the court under Domestic Relations Law § 115 (9) to dispense with an adoptive parent's appearance "for good cause shown". The Court reasoned that whether good cause had been shown here was a factual determination in which appellant's unwillingness to proceed with the adoption was only one factor to be considered. Accordingly, the Court identified the dispositive issue here as whether an adoption court under the New York statutory scheme has the power to prevent an adoptive parent from revoking consent under the circumstances presented.
*99 The Appellate Division found that authority to proceed with the adoptions under the foregoing circumstances exists, and should be exercised in the instant case, for two reasons. The Court found that the finalization of the adoptions would be in the children's best interests, irrespective of appellant's unwillingness to assume a parental role, because appellant's age and physical disabilities would have limited his role in any event largely to that of providing financial support. Finally, the Appellate Division concluded that appellant should be equitably estopped from revoking his consent because his words and actions resulted in irreversible changes in the positions of respondent and the children, so that "[w]ithdrawal of his commitments at this stage would redound to the detriment of both [respondent] and the children" (189 AD2d, at 387). Accordingly, the Appellate Division reversed and granted the joint petitions for the adoption of both children.
We granted leave to appellant to consider this case of first impression. We now reverse the order of the Appellate Division and reinstate the order of the Surrogate's Court, although on different reasoning.
Initially, we note our agreement with the Appellate Division that the refusal of appellant to appear for examination pursuant to Domestic Relations Law § 115 (3) was not fatal to the granting of the adoptions. Contrary to the arguments of appellant, there is nothing in the language of the statute or its legislative history to suggest that one of the purposes of the statutory requirement for the appearance of an adoptive parent for "examination" by the adoption court was to protect the rights of that person by insuring his or her continued willingness to finalize the adoption at the second stage of the private placement adoption proceeding. The statute clearly permits the requisite appearance by an adoptive parent or, for that matter, a biological parent or other person whose consent to the adoption is necessary, to occur before the second stage and during, even at an early point of, the first stage of the proceeding (see, Domestic Relations Law § 115 [3]). The authority of the court to dispense with such appearance for good cause shown is also inconsistent with any such purpose protective of the adoptive parents. As demonstrated here, an adoptive parent who decides not to proceed with finalization of a private placement adoption at the second stage has a ready alternative means to convey to the court that change of position, i.e., a motion to revoke the consent *100 and agreement of adoption. Moreover, in the trial in this case, at which appellant and respondent appeared and testified, there was a full exploration of whether appellant competently, knowingly and voluntarily executed the agreements of adoption and consent, and whether granting the adoptions would serve the best interests of the children. Therefore, all of the purposes of the statutory appearance of the adoptive parents for examination before the court were completely fulfilled in this case.
We also conclude, with the Appellate Division, that Surrogate's Court erred in requiring specific statutory authorization before an adoption court can proceed to finalization and override an adoptive parent's revocation of consent and attempted withdrawal from the adoption proceeding. Courts have inherent power to deny a party the right to discontinue a proceeding if prejudice or injustice to another party will result (see, Tucker v Tucker, 55 N.Y.2d 378, 383-384; Schultz v Kobus, 15 AD2d 382, 383). Moreover, the doctrine of equitable estoppel may and has been applied in statutory proceedings by courts of limited jurisdiction (see, Matter of Sharon GG. v Duane HH., 95 AD2d 466, 468, affd 63 N.Y.2d 859 [paternity proceeding, Family Court]). The Surrogate's Court has full equity powers in matters over which it has jurisdiction (see, SCPA 201 [2]; Siegel and Connors, Practice Commentaries, McKinney's Cons Laws of NY, Book 58A, SCPA 201, at 50-51).
Thus, an adoption court is not powerless, in an appropriate case, to dispense with an adoptive parent's appearance and, if all the other statutory requirements have been met, grant an adoption over an adoptive parent's objection and attempt to revoke consent and discontinue the proceeding. In our view, however, that power should be exercised only in the rarest and most exceptional of circumstances where, due to the conduct of the adoptive parent in taking custody and processing the adoption, the child's interests would be severely and unavoidably prejudiced as a result of being deprived of status as the legal child of the adoptive parent.
The power to impose an adoption should not be exercised merely because, upon a balancing of factors, the adoption might serve the immediate best interests of the child, the standard suggested by respondent, and perhaps applied by the Appellate Division in emphasizing the financial advantages that would inure to the children from their adoption by appellant. The right of a child and corresponding obligation of *101 a parent regarding support is only one  and far from the most vital  of the bundle of reciprocal rights and responsibilities in the intimate parent-child relationship created by a legal adoption as envisaged under our statute. "Our adoption statute embodies the fundamental social concept that the relationship of parent and child may be established by operation of law. * * * Despite the absence of any blood ties, in the eyes of the law an adopted child becomes `the natural child of the adoptive parent' with all the attendant personal and proprietary incidents to that relationship" (Matter of Robert Paul P., 63 N.Y.2d 233, 236 [citations omitted]).
Regardless of any agreement or understanding between appellant and respondent as to their respective roles in rearing Baby Boy C. and Baby Girl O., the creation of the parent-child relationship finalizing the joint adoptions of these children would impose the full range of State-sanctioned responsibilities upon appellant to provide for the proper care and protection of their physical, emotional and mental well-being (see, Family Ct Act § 1012 [f]).
In severely restricting the use of a court's equitable power to direct the finalization of an adoption by an unwilling adoptive parent, we act consistently with long-standing equity doctrine. Thus, courts will rarely if ever grant specific performance of a contract for personal services. "It has long been a principle of equity that the performance of contracts for personal services depends upon the skill, volition and fidelity of the person who [was] engaged to perform such services and that it is impracticable, if not impossible, for a court to supervise or secure the proper and faithful performance of such contracts" (American Broadcasting Cos. v Wolf, 76 AD2d 162, 173-174, affd 52 N.Y.2d 394 [emphasis supplied]). One scholar has concluded that the underlying basis for the equitable principle denying specific performance of personal service contracts is the rightful reluctance of courts in a society valuing freedom of association to impose a personal relationship upon an unwilling party:
"The most persuasive reason against routine specific performance in job cases are those that recognize the human elements of the situation. In some jobs the cooperation of the parties and the best efforts of the plaintiff are required to make the job work. In all situations, judges recognize the importance of free association in a free society and *102 rightly hesitate to use the power of the state to force a relationship one of the parties finds unacceptable" (3 Dobbs, Remedies § 12.22 [1], at 492 [2d ed]).
The foregoing considerations apply with even greater force with respect to the power of the State to force a parent-child relationship. Undoubtedly, it explains why, in fashioning the doctrine of equitable adoption to provide a remedy for a default in performing a promise to adopt, the courts have strictly limited the relief to the economic aspects of parenthood, imposing a duty of support upon the promisor-foster parent (see, Wener v Wener, 35 AD2d 50, 53; see also, Frye v Frye, 103 Nev 301, 302-303, 738 P2d 505, 506), or conferring rights of intestate succession in the promisor-foster parent's estate (see, Gavin v Aitken, 258 N.Y. 595; Middleworth v Ordway, 191 N.Y. 404; Matter of Mazzeo, 95 AD2d 91, 93; see also, Annotation, Modern Status of Law as to Equitable Adoption or Adoption by Estoppel, 97 ALR3d 347). In granting equitable adoption, the courts have expressly eschewed any purpose or effect to create a full-fledged parent-child status among the parties, or the equivalent of legal adoption (see, Matter of Mazzeo, supra; Frye v Frye, supra; Note, Equitable Adoption: They Took Him Into Their Home and Called Him Fred, 58 Va L Rev 727, 730, 738-739; see also, Erlanger v Erlanger, 102 Misc 236, 237, affd 185 App Div 888; Matter of Bamber, 147 Misc 712, 714).[*]
This case does not present the exceptional circumstances that would require the drastic and hitherto unprecedented remedy of imposing a legal adoption of Baby Boy C. and Baby Girl O. upon appellant against his will. First, under present Domestic Relations Law § 110, respondent, as "an adult married person who has been living separate and apart from * * * her spouse for at least three years" (Domestic Relations Law § 110 [L 1991, ch 254]) may adopt the children in her own right. Thus, respondent is able to achieve permanency for the children without submitting to a divorce or entering into a separation agreement upon appellant's terms. Second, under the equitable principles previously discussed, denial of the adoptions by appellant will not leave the children or respondent *103 as their guardian without recourse to an appropriate economic remedy for appellant's default, either in the pending divorce action (see, Wener v Wener, 35 AD2d 50, supra) or in a separate plenary action (see, Weinberger v Van Hessen, 260 N.Y. 294).
Despite respondent's apprehensions to the contrary, we do not consider that affording equitable relief to the children and respondent for appellant's default will be barred by the provision in Domestic Relations Law § 110 that a child adopted by a separated, married adult "shall not be deemed the child or step-child of the non-adopting spouse for the purposes of inheritance or support rights". As previously discussed, equitable adoption is not based upon the notion that the beneficiary of that relief is deemed to be the child of the foster parent. It is based at least in part on estopping the foster (or here, prospective adoptive) parent from denying the child's rights because of the absence of that formal legal relationship.
It follows from the foregoing that remedies are available to respondent and the children to take the children out of legal limbo and legitimize their parent-child relationship, and also to provide for their economic security by imposing financial obligations upon appellant. The children's lack of permanent status and financial prejudice were the only detriments identified by the courts below that would have resulted from appellant's refusal to finalize this adoption, and they are the only possible harms supportable by the record. Because both detriments may be overcome short of forcing appellant to complete the adoption of the children, this case is not one where that drastic remedy should be imposed.
Accordingly, the order of the Appellate Division should be reversed, without costs, and the order of the Surrogate's Court, New York County, entered March 26, 1992 reinstated.
TITONE, J. (concurring).
I agree with the majority's conclusion that the order of the Appellate Division granting the petition for joint adoption should be reversed. However, I cannot agree with the majority's choice to recognize the potential existence of a court's equitable powers to grant an adoption outside of the framework of the adoption statutes and over an adoptive parent's objection. More critically, because I wholeheartedly believe that, as a matter of law, a child's best interests are never served by forcing an unwilling and unfit person to assume the intimacy and responsibility of *104 becoming a parent, I cannot join in an analysis such as the majority's, which holds open that possibility.
Adoption is a creature of statute (Matter of Seaman, 78 N.Y.2d 451, 455), governed solely by the provisions of Domestic Relations Law article VII. Thus, in this State, the only recognized means of creating the legal relationship of parent and child is to follow the procedures outlined in the adoption statutes (Matter of Robert Paul P., 63 N.Y.2d 233, 236-238). Indeed, given the "delicate and definitive nature of the adoption proceeding, which fundamentally touches and radically alters the lives of all concerned," adoption courts will require "[p]recise and exacting compliance" with those statutory mandates before granting an adoption (Dennis T. v Joseph C., 82 AD2d 125, 129).
As the majority recognizes (majority opn, at 102), the doctrine of equitable adoption has heretofore never been applied by the courts of this State to create more than a financial obligation upon a party who, for any one of a number of reasons, fails to complete the statutory adoptive process (see, Gavin v Aitken, 258 N.Y. 595; Middleworth v Ordway, 191 N.Y. 404; Matter of Mazzeo, 95 AD2d 91, 93; Wener v Wener, 35 AD2d 50; see also, Annotation, Modern Status of Law as to Equitable Adoption or Adoption by Estoppel, 97 ALR3d 347). Such restrictive application of the courts' equitable powers in the adoption context has been followed for good reason. "[A]doption imitates nature" and there is nothing more unnatural than to compel an unwilling person to accept the intimacy of parenthood "with all the attendant personal and proprietary incidents to that relationship" (Matter of Robert Paul P., 63 N.Y.2d 233, 236, supra).
Notwithstanding that fact, the majority here suggests that in the "rarest and most exceptional of circumstances" an adoption court has the equitable power, when the preliminary statutory prerequisites to adoption are satisfied, to "grant [a full] adoption over an adoptive parent's objection" (majority opn, at 100). This conclusion constitutes an unwarranted departure from the time-honored "general rule [that] equity will not enforce a contract involving a personal relationship such as that created by adoption" (Erlanger v Erlanger, 102 Misc 236, 237, affd 185 App Div 888).
Manifestly, these are the least persuasive circumstances in which to recognize a departure from that rule. Beyond the facts of this case, the problems associated with forcing the *105 creation of that permanent legal bond between a child and a prospective adoptive parent who is judicially found "not fit" and "unwilling" to proceed with an adoption are monumental and numerous. For example, the possibility exists that the "fit" adoptive parent who was intended to be the primary caregiver will predecease the "unfit" adoptive parent who is left to assume the children's daily care. In that tragic scenario, the adoption court will have placed the child directly into the hands of a person who is not equipped to "establish[] a real home for a child" (Matter of Malpica-Orsini, 36 N.Y.2d 568, 572) or able to appropriately provide for the child's emotional or physical needs.
Recognizing the "drastic and hitherto unprecedented" nature of imposing an equitable adoption upon an unwilling party (majority opn, at 102), the majority has declined to impose an equitable adoption in this case. Yet, as the dissent in this case well appreciates, it is hard to imagine a case with facts more rare and extraordinary than these, where the prospective adoptive father, well able to improve the children's welfare through his wealth and status, has, by his acts and promises, caused two children and his spouse to cross the globe in furtherance of creating a parent-child relationship (see, dissenting opn, at 111). If this is not a "rare and exceptional" circumstance, it is difficult to imagine what facts would warrant invoking equitable powers as the majority now sanctions.
Rather than leaving the door open to some unexplored and heretofore unknown equitable power to force an unwanted parental relationship, I would hold that the statutory scheme forecloses that possibility. The statutory adoption scheme imposes on the adoption court the task of determining whether the proposed adoption is within the best interests of the children before formalizing the relationship (Domestic Relations Law § 116 [4]). In my view, the child's best interests can never be served by forcing an unfit and unwilling person to fully adopt a child and assume  by operation of law  the legal, moral and financial responsibilities that parenthood involves (see, Matter of Robert Paul P., supra, at 236). The creation of an artificial legal relationship with a person who rejects the child and will avowedly not take steps to provide nurture contravenes one of the fundamental purposes of the best interests inquiry  to ensure that the child is placed in a stable home environment. Accordingly, as a matter of law, the *106 indispensable best interests test cannot be met in these circumstances.
To the extent that concerns are raised about the children's economic well-being, other viable alternatives to full adoption exist, as even the majority notes (majority opn, at 102-103). In this situation, for example, it is conceivable that appellant's promises to support the children in the adoption agreements and immigration petition may well provide the basis for an order of financial support sought in a separate proceeding, or in conjunction with the presently pending divorce proceeding. Those options render the majority's recognition of a potential equitable remedy of full legal adoption unwarranted here.
Under the unprecedented standard adopted by the majority, every adoption court will now be faced with determining whether the rare and exceptional circumstances warranting the imposition of legal parenthood exist on the facts before it. Manifestly, whether to create the adoptive parent-child relationship over an adoptive parent's objection is a policy decision best left for the Legislature  the body which "`has supreme control of the subject'" of adoption (Carpenter v Buffalo Gen. Elec. Co., 213 N.Y. 101, 107, quoting Matter of Cook, 187 N.Y. 253, 260), and which is best equipped to study the long-term, and assuredly detrimental, effects of that forced relationship upon the welfare of children.
BELLACOSA, J. (dissenting).
I agree with Judge Levine's majority articulation of the applicable principles of the law, including that judicial imposition of parentage by adoption on an objecting individual is a "drastic" and "unprecedented" matter. However, I disagree with the application of the governing principles to this exceptional case in which that extraordinary equitable relief should be upheld. I would affirm the order of the Appellate Division.

I.
This case is about judicial completion of a joint adoption application set in motion by appellant and his wife in Surrogate's Court affecting the status and well-being of two children, now aged six, who are the subjects of this proceeding and appeal. Baby Boy C., born in the Philippines in July 1987, lived under the custody and care of appellant initially jointly with the wife after being admitted into the United States in February 1988. Baby Girl O., born in Philadelphia, Pennsylvania, *107 was placed in the physical custody of the putative adoptive parents on May 13, 1988, just two days after her birth. The appellant, putative adoptive father, was described by a nurse's aid as having significant contact with Baby Boy C. in his home for approximately nine months.
Seven months after Baby Boy C. arrived in this country and five months after custody of Baby Girl O. was given to the adoptive parents, they filed their 1988 joint adoption petition in Surrogate's Court, New York County. The husband and wife, though more lately engaged in a bitter public divorce action, have remained jointly responsible for the care, welfare, maintenance and education of the children. The duty and responsibility to support the children sprang not only from filing the joint adoption petition, but also, in the case of Baby Boy C., from the citizen naturalization petition in which appellant certified under penalty of perjury that, "I will care for the beneficiary of this petition properly if the beneficiary is admitted to the United States". Neither child has known anyone but these two people as their parents.
In 1990, appellant commenced a divorce action against the putative adoptive mother in whose sole custody the youngsters have been after appellant separated from the family. Appellant did not make a formal motion in Surrogate's Court to revoke his consent to the adoption or to discontinue the adoption proceeding until November 1990.
At the adoption hearing in 1991, Surrogate Roth rejected appellant's claim that he did not understand the adoption petition and found that "[t]he record [was] devoid of any showing of fraud or misrepresentation" (153 Misc 2d 916, 920). She relieved appellant, however, of adoption responsibility under prevailing principles of law. The Appellate Division agreed with the Surrogate's essential factual findings, but held that it was in the best interest of the children for the joint adoption to be finalized. That Court found that appellant made "firm commitments and [took] deliberate steps in furtherance of these adoptions" (189 AD2d 382, 387). The findings of both courts have evidentiary support in the record, but the result reflected in the Appellate Division decision is legally warranted and correct.
In the effort to adopt Baby Boy C., appellant caused that infant to be moved halfway around the world to enter appellant's home by reason of his inducements. Appellant made a conceded, formal promise to his wife, to the child, to the *108 Surrogate's Court, and to the United States Government that he would care for Baby Boy C. if the child were admitted to the United States, ultimately for adoption by him. With Baby Girl O., appellant paid the birth mother's medical expenses and caused the infant to be placed in his own and his wife's joint custody, just two days after birth. In reliance on appellant's promise to adopt, Baby Girl O.'s biological mother executed an irrevocable consent, surrendering her parental bond and rights.
The majority, nevertheless, concludes that this is not an "exceptional" case qualifying for the invocation of equitable relief. Two reasons are advanced for declining to exercise equitable remedies (majority opn, at 102, 102-103). First, significant weight is given to the fact that the putative adoptive mother, as "an adult married person who has been living separate and apart from * * * her spouse [appellant] for at least three years," may adopt alone (Domestic Relations Law § 110). Second, the children, regardless of adoption, are found to enjoy potential legal recourse against appellant for economic support. These factors may be relevant, but they are not dispositive in this case. Flexible judicial Chancellor's powers emerged as the historical outgrowth in Anglo-American jurisprudence against the rigidity of the "at law" forms of relief (see, 1 Holdsworth, History of English Law, at 395-476 [6th ed]; Adams, The Origin of English Equity, 16 Colum L Rev 87 [1916]). The words of this Court's premiere jurist and instructor in law and equity, Chief Judge Benjamin N. Cardozo, captures the essence of a Chancellor's role in adjudicating a case such as this: "[l]et the hardship be strong enough, and equity will find a way, though many a formula of inaction may seem to bar the path" (Graf v Hope Bldg. Corp., 254 N.Y. 1, 13 [dissenting opn]). I would thus affirm the Appellate Division's direction for joint adoption and then let nature and still pending related judicial proceedings take their course.

II.
The paramount concern of the courts in any adoption proceeding is the welfare of the child (see, Matter of Robert Paul P., 63 N.Y.2d 233, 237; Domestic Relations Law § 116). Undeniably, irreversible actions were triggered by appellant and undertaken by others directly affecting these children, their welfare and their right to a promised parental bond. The infants were transported as to place and transformed as to *109 custodianship. There was inducement, promise and detrimental reliance of the most profound nature. Appellant is directly responsible for the irreversible changes of position which has kept these children dangling at extreme risk and disadvantage socially, psychologically, as well as financially. Indeed, nearly six years have passed since appellant extended his welcoming hand. His about-face and rejection has put these two children into an extended parental limbo. As apparent pawns in the marital rupture between this appellant husband and his wife, the children have been already irretrievably deprived of a substantial portion of the promised parental relationship. The clock ticks and years pass as their finite childhood unfolds. Detrimental reliance and irretrievable change of position should, at the very least, foreclose appellant's withdrawal from the pending adoption proceeding he jointly started (see, Nassau Trust Co. v Montrose Concrete Prods. Corp., 56 N.Y.2d 175, 184).
Equity should be the forum for remedying the unique harm inflicted by appellant on these children, because money damages at law would be inadequate (see, Matter of Burke v Bowen, 40 N.Y.2d 264, 267; 3 Pomeroy, Equity Jurisprudence §§ 1401, 1402, 1407 [1st ed]). No money damages can compensate for the deprivation of the promised parental nurturing all these years and now permanently. Divesting the infants of their natural parental ties forever in return for a seductive promise to substitute a new family tie should have proportionate consequences. That irrevocable change in the children's parent-child status leaves them without family security, lineage or pedigree. Appellant's evidently mean-spirited change of mind reflects the quintessential change in position meriting equitable judicial intervention because there is no possibility of return to status quo ante. In this case, no secure status quo in futuro is even possible.
The acceptance of an obligation intuitively, instinctively and freely rooted in one's own acts, is the soul of equity (see, Wood v Lucy, Lady Duff-Gordon, 222 N.Y. 88, 90-91). Reinforcing the need for equitable intervention is appellant's formalized actions by part and substantial performance, in solemnly starting a joint judicial proceeding to adopt. We have said that "[c]ourts do not arbitrarily refuse specific performance of an agreement * * * when equity seems to demand that the parties be compelled to carry out such agreement * * *. Especially is this the rule, almost of right, where one of the parties has partly performed or changed * * * position in *110 reliance on the contract, and common justice forbids that the other party should, on some technicality" (Harris v Shorall, 230 N.Y. 343, 347-348 [emphasis added]).
The mere fact that appellant's spouse may singly pursue and qualify for adoption does not change the legal linkage which has always existed between the rights and responsibilities of the appellant promisor to the directly affected children (see, Domestic Relations Law § 110 ["(a)doption is the legal proceeding whereby a person takes another person into the relation of child and thereby acquires the rights and incurs the responsibilities of parent"]). This statute does not speak only to financial support or security, but to parental relationship, expectations and, in this case, entitlement to special relief tailored to the detrimental reliance and irreversible changes of position wrought by appellant. In these extraordinary circumstances, this Court must be concerned not only with the material maintenance of the children, but also with their physical, mental, moral and civic development.
Additionally, this case is not simply a matter of money. The potentiality of child support squeezed ultimately out of appellant is not an adequate remedy at law or a just solution for this double disaster examined in its full human dimension. Nor is this case about remedying lost intimacy. I fully recognize that equity cannot command love or filial feelings. But it can redress a betrayal of promised parentage which deprives these children of their familial identity and mooring in the now and their full dimensional security in the future. The remedy I propose, as found by the Appellate Division, seeks to correct deficits that are more than money, yet less than intimacy, which are nevertheless tangible and remediable within the prudential and flexible range of equity's traditional beneficial reach.
Weinberger v Van Hessen (260 N.Y. 294) is instructive. There, the defendant induced an infant's mother to transport her child to America and surrender custody, care and control based on a promise to support the child and direct his education and control his religious and moral upbringing. Two years after accepting custody of the child, the caregiver changed his mind. The Court affirmed the determination of the Appellate Division  as I propose we do here  which then denied the care-promisor's motion to dismiss the infant's claim in equity for specific performance. The Court noted that the agreement concerned not only the child's custody, "but also * * * the mental, moral and religious training of the child" *111 (id., at 298). While the agreement there did not deal directly with formalized adoption, the essence of the arrangement did not differ essentially from the transformation effected on the two infants in the instant case. Here, the Court is presented with a modern variation of the Weinberger dilemma. The wisdom found in that case provides guidance here to a prudent and supportable result  affirmance of the Appellate Division's direction for a grant of the joint adoption petition.

III.
Equity and the New York Surrogate's Court  the forum renowned as the special haven of orphans and surviving spouses  are not bereft of the parens patriae power to shape the remedy for appellant's wrongs (see, SCPA 201, 202, 209; NY Const, art VI, § 12 [d], [e]). Appellant's misconduct under the unique circumstances of this extraordinary case need not be excused because of fretting over open-ended precedential implications and potentialities. Pomeroy proclaimed that "[e]quitable remedies * * * are distinguished by their flexibility, their unlimited variety, [and] their adaptability to circumstances. * * * [T]he court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties" (1 Pomeroy, Equity Jurisprudence § 109 [1st ed]; see also, Matter of Lipschutz [Gutwirth], 304 N.Y. 58, 63). Individualized judicial discretion and prudence are the proper limits and checks against overgeneralized remedies that would flow from threatened floodgated repercussions.
While I fully appreciate the concerns expressed by my colleagues that the legal and judicial imputation of parentage, over objection, represents a grave step, this case qualifies, in my view, for Pomeroy's and Cardozo's most delicate, refined and exceptionally exercised implementation of the equitable writ. Appellant's conduct and the children's well-being, in all dimensions of their fragile existence, are what equity's promise is designed to correct. Thus, I would affirm the Appellate Division's prudent and correct resolution of this profoundly wrenching controversy.
Order reversed, etc.
NOTES
[*] For self-evident reasons, courts will be more inclined to impose equitable estoppel to protect the status interests of a child in an already recognized and operative parent-child relationship (see, Matter of Sharon GG. v Duane HH., supra; Michel DeL. v Martha P., 173 AD2d 308; Matter of Boyles v Boyles, 95 AD2d 95; see also, Harper v Lindsey, 162 Ga 44, 132 SE 639).