OPINION OF THE COURT
Levine, J.
On this appeal, we review an order of the Appellate Division granting joint adoption of two children by a married couple despite the refusal of one of the spouses to appear for examination before the Surrogate’s Court in accordance with statutory requirements and his attempt to withdraw from the proceeding and revoke his agreement and consent to the adoption.
Appellant and respondent are husband and wife. They initially married in 1969, divorced shortly thereafter but continued for a time to live together. A child was born of this union in 1972. A period of physical separation followed. After appellant suffered a debilitating stroke in 1983, the couple reconciled and then entered into a second marriage in August of that year. At the time of their remarriage, appellant was 72 years old and respondent was 40. Concededly, appellant is a highly successful entrepreneur and has amassed a considerable fortune.
Over the ensuing years appellant and respondent made various joint and individual efforts to find a child for them to adopt. In early 1988, respondent was able to obtain Baby Boy C., an abandoned child, from a child care agency in the Philippines. In order to facilitate Baby Boy C.’s immigration to the United States, appellant executed a petition to the United States Department of Justice to classify the child as an immediate relative, in which appellant certified that he would "care for the beneficiary of this petition properly if the beneficiary is admitted to the United States”.
During the same time frame that the parties were obtaining custody of Baby Boy C., respondent was put in contact with a pregnant woman in Philadelphia, Pennsylvania, who wished to place her baby for adoption at birth. The woman gave birth to Baby Girl O. in May 1988, appellant having paid the woman’s birth expenses, and respondent brought Baby Girl O. to New York City the following month.
In November 1988, appellant and respondent filed in Surrogate’s Court, New York County, joint petitions for the adoptions of Baby Boy C. and Baby Girl O. containing the parties’ consents to adopt the children. They also submitted duly *97 executed and acknowledged agreements of adoption. About a month later, however, appellant and respondent again became estranged. During the months that followed, the remaining statutory requirements of stage one of the private-placement adoptions of the two children were essentially fulfilled (see, Domestic Relations Law § 116 [2]), including the appearance and consent of Baby Girl O.’s biological mother (Domestic Relations Law § 115 [3]), the investigation and report of a disinterested person regarding the adoptive parents’ history, physical and mental health and financial circumstances (Domestic Relations Law § 116 [3]) and the completion of the six-month waiting period from the filing of the petitions for adoption (Domestic Relations Law § 116 [1]).
Appellant, however, failed to appear before the Surrogate for examination in order to finalize the adoptions (see, Domestic Relations Law § 115 [3]) and he commenced an action against respondent for a divorce. Respondent moved pursuant to Domestic Relations Law § 115 (9) to dispense with appellant’s appearance for examination by the Surrogate’s Court in the adoption proceeding. Appellant appeared in response to the motion and signified his unwillingness to adopt the children. In November 1990, appellant formally moved to revoke his consents and agreements of adoption and to discontinue the proceedings.
After a trial on all outstanding factual issues, Surrogate’s Court rendered a decision dismissing the joint adoption petitions without prejudice to the right of respondent to commence an adoption proceeding in the future (153 Misc 2d 916). The court found that, despite appellant’s protestations to the contrary, he had knowingly and willingly participated in the procurement of Baby Boy C. and Baby Girl O. for purposes of their adoption (in accordance with representations he made to respondent to induce her to remarry him) and that he competently and intentionally executed the consents and agreements of adoption of the two children. The Surrogate also found that the children were emotionally bonded to respondent as their mother and that she was completely fit to fulfill the parental role and should retain custody in the children’s best interests.
The Surrogate also found that the children would likely be prejudiced if appellant were permitted to revoke his consents and agreements of adoption in that, under Domestic Relations Law § 110 as then in effect, respondent, as an adult married *98 person, could only adopt the children independently of her spouse if she were living apart pursuant to a judgment of separation or a formally executed separation agreement (Domestic Relations Law former § 110). Thus, the permanent status of Baby Boy C. and Baby Girl O. as legal children of respondent would have remained contingent upon appellant’s obtaining a divorce in the contested matrimonial action pending between the parties or the parties’ entering into a separation agreement. The Surrogate expressed her regret that, thus, "these children are apparently being used as bargaining chips in the pending matrimonial action” (153 Misc 2d, at 922).
Nonetheless, the Surrogate felt compelled to dismiss the joint petitions. The court reasoned that, because adoption is solely a creature of statute, express statutory authorization would be required before a court could decree specific performance of an agreement of adoption against the will of a prospective adoptive parent who had a change of heart before the finalization of the adoption. The court was unable to discern any such statutory authorization for a forced adoption in Domestic Relations Law § 115 (9), authorizing the court to dispense with the statutory requirement of the appearance of an adoptive parent for examination based upon a showing of good cause. The court concluded that this rather innocuous provision could not have been intended by the Legislature to cover such a momentous result as permitting a court to confer the full range of parental rights upon someone unwilling to accept, and, in this case, clearly unfit to exercise, them.
The Appellate Division reversed (189 AD2d 382). It held, first, that appellant could not effectively exercise an absolute veto over the finalization of the adoptions of Baby Boy C. and Baby Girl O. by the simple expedient of refusing to make the requisite appearance before the adoption court pursuant to Domestic Relations Law § 115 (3). The Appellate Division pointed to the authority granted the court under Domestic Relations Law § 115 (9) to dispense with an adoptive parent’s appearance "for good cause shown”. The Court reasoned that whether good cause had been shown here was a factual determination in which appellant’s unwillingness to proceed with the adoption was only one factor to be considered. Accordingly, the Court identified the dispositive issue here as whether an adoption court under the New York statutory scheme has the power to prevent an adoptive parent from revoking consent under the circumstances presented.
*99 The Appellate Division found that authority to proceed with the adoptions under the foregoing circumstances exists, and should be exercised in the instant case, for two reasons. The Court found that the finalization of the adoptions would be in the children’s best interests, irrespective of appellant’s unwillingness to assume a parental role, because appellant’s age and physical disabilities would have limited his role in any event largely to that of providing financial support. Finally, the Appellate Division concluded that appellant should be equitably estopped from revoking his consent because his words and actions resulted in irreversible changes in the positions of respondent and the children, so that "[withdrawal of his commitments at this stage would redound to the detriment of both [respondent] and the children” (189 AD2d, at 387). Accordingly, the Appellate Division reversed and granted the joint petitions for the adoption of both children.
We granted leave to appellant to consider this case of first impression. We now reverse the order of the Appellate Division and reinstate the order of the Surrogate’s Court, although on different reasoning.
Initially, we note our agreement with the Appellate Division that the refusal of appellant to appear for examination pursuant to Domestic Relations Law § 115 (3) was not fatal to the granting of the adoptions. Contrary to the arguments of appellant, there is nothing in the language of the statute or its legislative history to suggest that one of the purposes of the statutory requirement for the appearance of an adoptive parent for "examination” by the adoption court was to protect the rights of that person by insuring his or her continued willingness to finalize the adoption at the second stage of the private placement adoption proceeding. The statute clearly permits the requisite appearance by an adoptive parent or, for that matter, a biological parent or other person whose consent to the adoption is necessary, to occur before the second stage and during, even at an early point of, the first stage of the proceeding (see, Domestic Relations Law § 115 [3]). The authority of the court to dispense with such appearance for good cause shown is also inconsistent with any such purpose protective of the adoptive parents. As demonstrated here, an adoptive parent who decides not to proceed with finalization of a private placement adoption at the second stage has a ready alternative means to convey to the court that change of position, i.e., a motion to revoke the consent *100 and agreement of adoption. Moreover, in the trial in this case, at which appellant and respondent appeared and testified, there was a full exploration of whether appellant competently, knowingly and voluntarily executed the agreements of adoption and consent, and whether granting the adoptions would serve the best interests of the children. Therefore, all of the purposes of the statutory appearance of the adoptive parents for examination before the court were completely fulfilled in this case.
We also conclude, with the Appellate Division, that Surrogate’s Court erred in requiring specific statutory authorization before an adoption court can proceed to finalization and override an adoptive parent’s revocation of consent and attempted withdrawal from the adoption proceeding. Courts have inherent power to deny a party the right to discontinue a proceeding if prejudice or injustice to another party will result (see, Tucker v Tucker, 55 NY2d 378, 383-384; Schultz v Kobus, 15 AD2d 382, 383). Moreover, the doctrine of equitable estoppel may and has been applied in statutory proceedings by courts of limited jurisdiction (see, Matter of Sharon GG. v Duane HH., 95 AD2d 466, 468, affd 63 NY2d 859 [paternity proceeding, Family Court]). The Surrogate’s Court has full equity powers in matters over which it has jurisdiction (see, SCPA 201 [2]; Siegel and Connors, Practice Commentaries, McKinney’s Cons Laws of NY, Book 58A, SCPA 201, at 50-51).
Thus, an adoption court is not powerless, in an appropriate case, to dispense with an adoptive parent’s appearance and, if all the other statutory requirements have been met, grant an adoption over an adoptive parent’s objection and attempt to revoke consent and discontinue the proceeding. In our view, however, that power should be exercised only in the rarest and most exceptional of circumstances where, due to the conduct of the adoptive parent in taking custody and processing the adoption, the child’s interests would be severely and unavoidably prejudiced as a result of being deprived of status as the legal child of the adoptive parent.
The power to impose an adoption should not be exercised merely because, upon a balancing of factors, the adoption might serve the immediate best interests of the child, the standard suggested by respondent, and perhaps applied by the Appellate Division in emphasizing the financial advantages that would inure to the children from their adoption by appellant. The right of a child and corresponding obligation of *101 a parent regarding support is only one — and far from the most vital — of the bundle of reciprocal rights and responsibilities in the intimate parent-child relationship created by a legal adoption as envisaged under our statute. "Our adoption statute embodies the fundamental social concept that the relationship of parent and child may be established by operation of law. * * * Despite the absence of any blood ties, in the eyes of the law an adopted child becomes 'the natural child of the adoptive parent’ with all the attendant personal and proprietary incidents to that relationship” (Matter of Robert Paul P, 63 NY2d 233, 236 [citations omitted]).
Regardless of any agreement or understanding between appellant and respondent as to their respective roles in rearing Baby Boy C. and Baby Girl O., the creation of the parent-child relationship finalizing the joint adoptions of these children would impose the full range of State-sanctioned responsibilities upon appellant to provide for the proper care and protection of their physical, emotional and mental well-being (see, Family Ct Act § 1012 [f]).
In severely restricting the use of a court’s equitable power to direct the finalization of an adoption by an unwilling adoptive parent, we act consistently with long-standing equity doctrine. Thus, courts will rarely if ever grant specific performance of a contract for personal services. "It has long been a principle of equity that the performance of contracts for personal services depends upon the skill, volition and fidelity of the person who [was] engaged to perform such services and that it is impracticable, if not impossible, for a court to supervise or secure the proper and faithful performance of such contracts” (American Broadcasting Cos. v Wolf, 76 AD2d 162, 173-174, affd 52 NY2d 394 [emphasis supplied]). One scholar has concluded that the underlying basis for the equitable principle denying specific performance of personal service contracts is the rightful reluctance of courts in a society valuing freedom of association to impose a personal relationship upon an unwilling party:
"The most persuasive reason against routine specific performance in job cases are those that recognize the human elements of the situation. In some jobs the cooperation of the parties and the best efforts of the plaintiff are required to make the job work. In all situations, judges recognize the importance of free association in a free society and *102 rightly hesitate to use the power of the state to force a relationship one of the parties finds unacceptable” (3 Dobbs, Remedies § 12.22 [1], at 492 [2d ed]).
The foregoing considerations apply with even greater force with respect to the power of the State to force a parent-child relationship. Undoubtedly, it explains why, in fashioning the doctrine of equitable adoption to provide a remedy for a default in performing a promise to adopt, the courts have strictly limited the relief to the economic aspects of parenthood, imposing a duty of support upon the promisor-foster parent (see, Wener v Wener, 35 AD2d 50, 53; see also, Frye v Frye, 103 Nev 301, 302-303, 738 P2d 505, 506), or conferring rights of intestate succession in the promisor-foster parent’s estate (see, Gavin v Aitken, 258 NY 595; Middleworth v Ordway, 191 NY 404; Matter of Mazzeo, 95 AD2d 91, 93; see also, Annotation, Modem Status of Law as to Equitable Adoption or Adoption by Estoppel, 97 ALR3d 347). In granting equitable adoption, the courts have expressly eschewed any purpose or effect to create a full-fledged parent-child status among the parties, or the equivalent of legal adoption (see, Matter of Mazzeo, supra; Frye v Frye, supra; Note, Equitable Adoption: They Took Him Into Their Home and Called Him Fred, 58 Va L Rev 727, 730, 738-739; see also, Erlanger v Erlanger, 102 Misc 236, 237, affd 185 App Div 888; Matter of Bomber, 147 Misc 712, 714).*
This case does not present the exceptional circumstances that would require the drastic and hitherto unprecedented remedy of imposing a legal adoption of Baby Boy C. and Baby Girl O. upon appellant against his will. First, under present Domestic Relations Law § 110, respondent, as "an adult married person who has been living separate and apart from * * * her spouse for at least three years” (Domestic Relations Law § 110 [L 1991, ch 254]) may adopt the children in her own right. Thus, respondent is able to achieve permanency for the children without submitting to a divorce or entering into a separation agreement upon appellant’s terms. Second, under the equitable principles previously discussed, denial of the adoptions by appellant will not leave the children or respon *103 dent as their guardian without recourse to an appropriate economic remedy for appellant’s default, either in the pending divorce action (see, Wener v Wener, 35 AD2d 50, supra) or in a separate plenary action (see, Weinberger v Van Hessen, 260 NY 294).
Despite respondent’s apprehensions to the contrary, we do not consider that affording equitable relief to the children and respondent for appellant’s default will be barred by the provision in Domestic Relations Law § 110 that a child adopted by a separated, married adult "shall not be deemed the child or step-child of the non-adopting spouse for the purposes of inheritance or support rights”. As previously discussed, equitable adoption is not based upon the notion that the beneficiary of that relief is deemed to be the child of the foster parent. It is based at least in part on estopping the foster (or here, prospective adoptive) parent from denying the child’s rights because of the absence of that formal legal relationship.
It follows from the foregoing that remedies are available to respondent and the children to take the children out of legal limbo and legitimize their parent-child relationship, and also to provide for their economic security by imposing financial obligations upon appellant. The children’s lack of permanent status and financial prejudice were the only detriments identified by the courts below that would have resulted from appellant’s refusal to finalize this adoption, and they are the only possible harms supportable by the record. Because both detriments may be overcome short of forcing appellant to complete the adoption of the children, this case is not one where that drastic remedy should be imposed.
Accordingly, the order of the Appellate Division should be reversed, without costs, and the order of the Surrogate’s Court, New York County, entered March 26,1992 reinstated.

 For self-evident reasons, courts will be more inclined to impose equitable estoppel to protect the status interests of a child in an already recognized and operative parent-child relationship (see, Matter of Sharon GG. v Duane HH., supra; Michel DeL. v Martha P., 173 AD2d 308; Matter of Boyles v Boyles, 95 AD2d 95; see also, Harper v Lindsey, 162 Ga 44, 132 SE 639).